# UNITED GAS PUBLIC SERVICE CO. *v.* TEXAS ET AL.

No. 13.   Argued October 15, 18, 1937.   Reargued December 14, 15, 1937.—Decided  February  14,  1938.

*Messrs. John P. Bullington* and *F. G. Coates* for appellant on the reargument. *Mr. F. G. Coates,* with whom *Mr. John P. Bullington* was on the brief, for appellant on the original argument.

*Messrs. Alfred M. Scott* and *Edward H. Lange,* with whom *Mr. William McCraw,* Attorney General of Texas, was on the brief, for appellees on the reargument and on the original argument.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

Appellant, United Gas Public Service Company, challenges the validity of a rate fixed by the Railroad Commission of Texas for natural gas supplied by appellant for domestic uses in the City of Laredo.

The City Council of Laredo, on December 15, 1931, enacted an ordinance fixing gas rates which included a rate of 40 cents per 1000 cubic feet for domestic consumption, with a provision for a discount of 10 per cent. on payment of bills within ten days, the ordinance to become effective on January 1, 1932. The rate had previously been 75 cents per m. c. f. with a 10 per cent. discount for payment within ten days. The Texas Border Gas Company, which was supplying natural gas to consumers in Laredo, filed an appeal with the Railroad Commission and posted the required supersedeas bond in accordance with the provisions of Articles 6058 and 6059 of the Revised Civil Statutes of Texas (1925).[1] The condition of

---

[1] "Art. 6058. *Appeal from city control.*—When a city government has ordered any existing rate reduced, the gas utility affected by such order may appeal to the Commission by filing with it on such terms and conditions as the Commission may direct, a petition and bond to review the decision, regulation, ordinance, or order of the city, town or municipality. Upon such appeal being taken the Commission shall set a hearing and may make such order or decision in regard to the matter involved therein as it may deem just and reasonable. The Commission shall hear such appeal *de novo.* Whenever any local distributing company or concern, whose rates have been fixed by any municipal government, desires a change of any of its rates, rentals or charges, it shall make its application to the municipal government where such utility is located and such municipal government shall determine said application within sixty days after presentation unless the determination thereof may be longer deferred by agreement. If the municipal government should reject such application or fail or refuse to act on it within said sixty days, then the utility may appeal to the Commission as herein provided. But said Commission shall determine the matters involved in any such appeal within sixty days after the filing by such utility of such appeal with said Commission or such further time as such utility shall in writing agree to, but the rates fixed by such municipal government shall remain in full force and effect until ordered changed by the Commission.

"Art. 6059. *Appeal from orders.*—If any gas utility or other party at interest be dissatisfied with the decision of any rate, classification,

the bond was that the Company should refund to the City for the benefit of consumers any excess of rates collected "over and above the rates and charges that shall be finally determined to be a fair and reasonable return upon the value of its property used and useful in supplying natural gas and natural gas service to the City of Laredo."

Prior to the hearing before the Commission, the South Texas Gas Company, which owned and operated the transmission properties and transported the gas sold to the Texas Border Gas Company at the Laredo city gate, was made a party to the proceeding. The Texas Border Gas Company applied to the City for an increase of rates and, because of the City's failure to act, took an appeal to the Commission as the statute provided. The two appeals were consolidated. The United Gas Public Service Company, a Delaware corporation, entered its appearance on both appeals alleging that it had acquired the properties of both companies. The Commission, by order of June 13, 1933, fixed a rate of 55 cents per m. c. f. with a penalty of 10 per cent. for non-payment within ten

rule, charge, order, act or regulation adopted by the Commission, such dissatisfied utility or party may file a petition setting forth the particular cause of objection thereto in a court of competent jurisdiction in Travis County against the Commission as defendant. Said action shall have precedence over all other causes on the docket of a different nature and shall be tried and determined as other civil causes in said court. Either party to said action may have the right of appeal; and said appeal shall be at once returnable to the appellate court, and said action so appealed shall have precedence in said appellate court of all causes of a different character therein pending. If the court be in session at the time such right of action accrues, the suit may be filed during such term and stand ready for trial after ten days notice. In all trials under this article the burden of proof shall rest upon the plaintiff, who must show by clear and satisfactory evidence that the rates, regulations, orders, classifications, acts or charges complained of are unreasonable and unjust to it or them."

days, and the order was made retroactive to January 1, 1932. 2 P. U. R. (N. S.) 503.

The United Gas Public Service Company then brought suit in the District Court of the United States for the Southern District of Texas to restrain the enforcement of the Commission's order. On July 26, 1933, the State of Texas, the members of the Commission and the City instituted the present suit in the District Court of Travis County in the nature of an appeal under Article 6059 [2] for the purpose of protecting the jurisdiction of the state court and of enforcing the Commission's order if determined to be valid. The state court thereupon stayed all proceedings by the Commission, or by the officials of the State and City, to enforce the Commission's order until the determination of the suit. On August 1, 1933, the District Court of the United States composed of three judges, 28 U. S. C. 380, stayed all proceedings in that court pending the final determination of the suit in the state court. Subject to the order of the state court, the Company has continued to charge its 75 cent rate.

The trial in the state court resulted in a judgment on April 24, 1934, which sustained the Commission's order of June 13, 1933, except so far as its rate was made retroactive to January 1, 1932, that part of the order being held invalid. The Company then appealed to the Court of Civil Appeals, which rendered its judgment on October 30, 1935, reforming the judgment of the trial court so as to declare the retroactive portion of the Commission's order valid and enforceable and affirming the judgment as thus modified. 89 S. W. (2d) 1094. The Supreme Court of the State refused writ of error.

A motion to dismiss the appeal taken to this Court from the judgment of the Court of Civil Appeals was denied. 301 U. S. 667. Upon hearing, the Court ordered reargu-

[2] See Note 1.

ment, noting that it especially desired to hear the parties on the state of the evidence as to the effect of the application of the Commission's rate to the years 1932 and 1933, that is, as to the revenues and expenses for those years on that basis, and as to the effect upon the rights of the appellant, with respect to those years, of the bond given on its appeal to the Commission. 302 U. S. 647. Reargument has been had accordingly.

Appellant, invoking the due process and equal protection clauses of the Fourteenth Amendment of the Federal Constitution, contends that in the state proceedings it has been denied procedural due process and also that the prescribed rate is confiscatory.

*The proceedings before the Commission and its rulings.* The Commission gave a full hearing. It received voluminous evidence offered by appellant and the City as to every phase of the controversy and their counsel were fully heard in argument. The opinion of the Commission reviews the history of the utility from the time that the Texas Border Gas Company received its franchise from the City in 1909. The Commission found the interrelation of the companies concerned and that the present appellant, which had become the owner of the properties of the former operating companies, was itself a unit of the United Gas System. It was in view of the "interrelated company operation and ownership," that the gathering, transmission and distribution properties used and useful in serving the city of Laredo were valued as a combined property. As consumers in a number of other communities within the Laredo area were also served, it became necessary to allocate to Laredo its appropriate proportion. Methods of allocation were submitted by the respective parties and the Commission adopted a weighted average per cent., which had been taken by the City's engineer as an approximate mean between two percentages used by the Company's engineer, as coming the

closest to a fair and correct allocation. Evidence of his-
torical cost and of reproduction cost new less depreciation
was submitted. The Company's appraisal on the basis of
reproduction cost new, less depreciation, was $1,231,601.
The appraisal of the City's engineer on the same basis
was $810,698. The City adduced evidence showing the
depreciated historical cost as of July 31, 1932, to be
$709,991.23.

The Commission for the purpose of its valuation di-
vided the properties into three groups, (a) gathering sys-
tem, (b) transmission system, and (c) distribution sys-
tem. The Commission stated and considered the
respective appraisals of each group. While the City in-
cluded an allowance of $124,668 as the depreciated cost of
that portion of the transmission lines extending from
Pescadito Junction to the Jennings Field, a distance of
about 26 miles, the Commission found "that this line was
used only one day during the twelve months' period end-
ing July 31, 1932, in transporting gas to Laredo," and
further that "the condition of this line is such that it
could neither safely nor profitably transport the necessary
volume of gas to the City." The Commission concluded
that, if the Company's properties were reproduced, that
section of the line would not be necessary.

The Commission then considered the questions of work-
ing capital, of going concern value and of accrued depre-
ciation. After referring to the respective estimates, the
Commission decided that "the over-all per cent. condi-
tion" of the properties was 78 per cent.

The Commission's conclusion was that the total "pres-
ent fair value" of the properties was $885,000. The Com-
mission said:

"In arriving at a decision and making an order herein
that is deemed by the Commission to be just and reason-
able, we have carefully and fully considered all the evi-
dence presented and all the facts and circumstances re-

flected by the record herein; and upon giving due consideration to all the elements of value inhering in the property involved in this proceeding, have valued the Company's properties as an operating concern, with business attached; have made ample allowance for materials and supplies, working cash, and general overheads; and have included in such value the Pescadito-Jennings Transmission Line and the West Jennings Gathering System (although the record clearly discloses that these last two named property items are neither being used, nor are they necessary as standby equipment), and we find the present fair value of the properties of the Company used, and useful in the gathering, transporting and distributing of natural gas within the City of Laredo, Texas, to be in the sum of $885,000."

The Commission fixed the annual depreciation rate which should be allowed at 3 per cent. The Commission also found that an annual rate of return of 7 per cent. on the present value of the properties was adequate.

With respect to "available revenue," the Commission said that the Company had presented a "setup" of operating revenues and expenses for the twelve months' period ending July 31, 1932, only. On the other hand, the City had presented a similar "setup" covering the years ending June 30, 1929, 1930 and 1931, and for the year ending July 31, 1932—a period of four years. The Commission was of the opinion that the one year ending July 31, 1932, should not be taken as a test period. It was believed to be a matter of common knowledge that "from a general business standpoint the year 1932 was the worst year since 1929." The City's exhibit was deemed to show that the fiscal year 1931 was also subnormal, and the Commission concluded that neither that year, nor an average of those two years, should be taken as an adequate test. The Commission also thought that it would be unfair to the Company to take the year 1930

or an average of the three years, 1930, 1931 and 1932, as it appeared that the year 1930 was the best year in point of gross revenues that the Company had experienced since 1928. On the whole, the Commission thought that justice would be done if an average of revenues and expenses for the four fiscal years, 1929, 1930, 1931 and 1932, should be taken as the test period for the computation upon which a fair return should be predicated.

It had been stipulated by the parties at the outset that a rate of five cents per m. c. f. was a fair and reasonable price of gas at the well. While the Commission did not make specific findings with respect to revenues and expenses for the years which it took as a basis, it did reject certain allowances for which the Company contended. As to an allowance of a gathering charge in relation to gas purchased from the Carolina-Texas field, the gathering lines in which were the property of an affiliate, the Commission allowed a charge of one-half of one per cent. instead of the one per cent. which the Company sought. With respect to items not particularized by the Commission, we think that it substantially appears from its opinion that the Commission, save as to the items disallowed, accepted the City's exhibit which covered the revenues and expenses for the four-year period and stated separately the items contained therein which were deemed to be questionable.

The Commission found the rate, for all domestic uses, of 55 cents per m. c. f., the minimum bill per user per month to be one dollar and the penalty for non-payment within ten days to be 10 per cent., to be "just and reasonable." The Commission found that its application would produce "a net return in excess of seven per cent (7%) per annum on the present fair value of the properties, after provision for operations and reserve for depreciation." The Commission ordered that the rate should be effective from and after January 1, 1932, and that there

should be refunded to the City of Laredo for the benefit of domestic gas consumers the difference between the amount collected under the existing rate and the amount that would have been due by consumers under the Commission's order.

*The proceedings in the District Court of Travis County.*—The trial was essentially *de novo*. It was begun in March, 1934, and was had before a jury, a motion by the appellants to have the jury discharged and the cause determined by the court being overruled. The entire record before the Commission was placed in evidence and additional testimony was introduced as to property values, depreciation reserve accrual, revenues, expenses, rates of return, etc. It appears that the evidence was brought as near as possible to the time of trial. The evidence as to revenues and expenses which appellant adduced again related to the year ending July 31, 1932, and the years 1932 and 1933, and the appellees introduced evidence for the four-year period, to which they had addressed their computations before the Commission, and also for the year 1933.

At the close of the evidence, appellant moved for a peremptory instruction in its favor and also for the suspension of the Commission's order for the years 1932 and 1933. These motions were overruled. Appellant then moved to have the case submitted to the jury on "special issues" and not upon a "special charge." The court stated that in its view its charge was on "special issue" and hence complied with the request. The appellant then moved to submit to the jury certain special issues which were separately stated; that is, that the jury should make separate findings as to the values of component parts of appellant's property during the years 1932 and 1933, respectively, also as to the amount of the necessary materials and supplies and cash working capital, and the amount which should be allowed for "going value," and

as to the average cost of gas at the well mouth and the proper annual allowance for the depreciation reserve. These requests were refused.

The trial court submitted to the jury a single special issue as follows:

"Do you find that the order of the Railroad Commission of Texas bearing date June 13, 1933, providing for a fifty-five cent gas rate to residential consumers within the city of Laredo, Texas, under the facts introduced in evidence before you, is unreasonable and unjust as to defendant, United Gas Public Service Company. Answer this question 'yes' or 'no'."

The court prefaced that submission with the following definitions and instructions:

That by "fair return" was meant that the appellant was entitled to earn a rate "on the present fair value of its property which it employs for the convenience of the public equal to that generally being made at the same time within the same general part of the country upon investments in other business undertakings which are attended by like risks and uncertainties." That the rate of return should be reasonably sufficient "to assure confidence in the financial soundness of the utility and should be adequate under efficient and economical management to maintain and support its credit and enable it to raise money necessary for the proper discharge of its duties."

That by "fair value" was meant "the reasonable worth of the property at this time that is being used and useful in the public service." That by "used and useful" was meant that it embraces all the property "actually being used" in that service and also such property as was reasonably necessary to permit "continuous and efficient service."

That by "operation expenses" was meant such expenses as were incurred in the operation of appellant's property in furnishing gas to the people of Laredo.

That by "annual depreciation" was meant the amount per annum that was reasonably necessary to compensate for the wearing out and any necessary replacements and retirements of appellant's property.

That by "reproduction cost new" was meant "the cost to the owner under the conditions which may reasonably be expected to exist if the property were to be reproduced new."

That by "going value" was meant the added value of appellant's property as a whole, used and useful for serving the City, over the sum of the values of its component parts, by reason of the fact "that it is an operating, assembled and established property, functioning with a trained personnel, a co-ordinated plant and property, with customers attached, and its business established."

Referring to the findings of the Commission, and the transcripts of evidence and exhibits, which were before the Commission and had been introduced in evidence, the court told the jury that the same might be considered for the purpose of assisting the jury in determining whether the Commission's order was unreasonable and unjust and for no other purpose. The court concluded its charge with the following instructions:

"You are instructed that the burden of proof is upon the defendant, United Gas Public Service Company, to show by clear and satisfactory evidence that the rate promulgated by the Railroad Commission in its said order of June 13, 1933, is unreasonable and unjust as to it.

"You are further instructed that in determining your answer to said issue in the light of all the evidence introduced in this case the defendant, United Gas Public Service Company, is entitled to receive a fair return at this time on the present fair value of its property that is used and useful in the public service after first deducting all necessary operating expenses and a fair and reasonable amount for the annual depreciation of said property, and

that in considering what is a fair value of said property you will take into consideration all elements of value that have been introduced in evidence before you, including reproduction cost new of said property and the amount of going value (if any) that inheres in said property.

"By 'unreasonable and unjust' is meant that the rate prescribed and adopted in the said order of the Railroad Commission was so low as to have not provided for a fair return upon the fair value of defendant's property used and useful in supplying the service furnished by the United Gas Public Service Company to the inhabitants within the city of Laredo, Texas."

Appellant took exceptions to the court's charge and to the refusal of its requests.

The jury answered the special issue in the negative. Appellant's motion for judgment *non obstante veredicto* was denied and judgment was entered.

The court in its judgment ruled that the provision in the Commission's order requiring the refund of the excess collections over the Commission's rate was a separable part, and as the court was of the opinion that the Commission's retroactive application of its rate to January 1, 1932, and the provision for a refund, were invalid, that part of the Commission's order was set aside without prejudice to the right of the City to recover the excess collections, should that provision be sustained on appeal. The judgment then enjoined appellant from making any charge in excess of the Commission's rate, with direction for supersedeas pending appeal upon the filing of a described bond. A motion for a new trial, in which appellant again stated its objections to the court's rulings, was denied.

*The ruling of the Court of Civil Appeals.*—The appellate court reached the conclusion that appellant had not only failed to establish its claim for reversal, and for judgment in its favor, but that "when viewed in the light

of the presumption in favor of the validity of the Commission's rate order, and of the quantum and character of proof required to overcome such presumption, the evidence adduced was insufficient, as a matter of law, to show that the 55¢ rate order was either unjust and unreasonable or confiscatory." In that view, the court added, "all questions of practice," presented by appellant, "go out of the case."

The court noted the fact that the Commission had reluctantly included in the valuation of the property the items of $124,688, representing the Pescadito-Jennings transmission pipe line, and also had "included the West Jennings Gathering System at a value of $10,342", although the Commission found that these "two property items are neither used nor are they necessary as standby equipment." The court also said that there was evidence before both the trial court and the Commission which tended to show "the fair value of appellant's property to be about $700,000; and that a 2% annual accrual for depreciation would be fair and reasonable." Referring to the evidence as to operating revenues and expenditures, the court set forth tables based on the computations of an expert accountant of the appellees showing average net revenues for the four-year period and the year 1933. These calculations were on the basis of appellant's existing 75 cent rate. The court thus stated the criterion which it applied in overruling appellant's contentions:

"The rule is settled that rates are not based upon the results of business of any one year alone, but upon what is estimated as being the average business over a period of years; the future being gauged as nearly as possible by the past experience. . . . It is also the rule that only actual experience under the rate complained of can furnish any real criterion or guide as to the effect of the rate on the business; and that this experience should be obtained by a practical test for such a period of time as

will under the facts of the particular business determine the matters which are of doubtful or uncertain influence. In absence of an actual test of the rate, the court on appeal must resolve all doubts against the complaining party; pare down valuations unsparingly; and the rate must appear to be clearly confiscatory, or unjust and unreasonable before the court should by injunction restrain its enforcement in advance of actual experience of the practical results of the rate. And while the equal protection, the due course, and the due process clauses of the fundamental laws of both state and nation guard against the taking of, or compelling of the use of private property for public service without just compensation, still they do not assure the public utility the right under all conditions and circumstances to have a return upon the value of the property so used. If actual experience for a proper period of time under the rate complained of should reveal sufficient reasons, the rate order may then be changed through proper channels."

Proceeding on this principle, the court said:

"In the instant case appellant has continuously charged and collected the 75¢ rate; hence no actual test has been made under the lower 55¢ rate. An actual test of the lower rate might have resulted in a larger return by bringing about an increase in appellant's business, and manifestly this court would not be warranted in holding that the lower rate was either confiscatory, or unjust and unreasonable, as a matter of law, in advance of an actual test of the rate; . . . So when the property valuation is pared down to this lowest valuation (about $700,000), and doubtful items of expenses are deducted, the net revenues received by appellant under the 75¢ rate for the year ending December 31, 1933, would afford more than a 11% return. And calculations based on the $700,000 valuation and the estimated difference in revenues between the 55¢ rate and the 75¢ rate, show a return of more

than 7% for the year 1933. But even if the lower rate did not or would not yield a return of 7% for the year 1933, this court would not be warranted in enjoining the enforcement of the rate, because the test period was too short, no actual test was made under the lower rate and the undisputed evidence showed the year to be abnormal."

In concluding its opinion, the court held that the trial court erred in its ruling that the retroactive provision of the Commission's order was invalid. The appellate court said that on the appeal to the Commission to review the City's ordinance, the Commission was authorized to suspend the rate fixed by the City and to require the utility to give a bond "on such terms and conditions as the Commission may direct." The trial court had refused to receive the bond in evidence but it appeared in the record. The appellate court quoted its condition and noted that the supersedeas bond filed on appeal to that court was similarly conditioned. The court held that the Commission had the power upon determining that the rate fixed by the City's ordinance was unreasonable to "substitute its own just and reasonable rate therefor, and to make it effective as of date of the city ordinance rate for which it was substituted."

The Court of Civil Appeals then entered judgment sustaining the retrospective and refund provision of the Commission's order and affirming the judgment of the trial court as thus modified.

*First.—The question of procedural due process.*—There is no ground for holding that appellant did not have a fair hearing before the Commission. Appellant's evidence was received and weighed; its arguments were heard and considered. The Commission made findings as to the value of appellant's property, the permissible allowance for depreciation and the rate of return. The amounts of revenues and expenses for the four years

which the Commission took as a basis sufficiently appear, as already stated, from the City's exhibit to which the Commission referred in its opinion. The estimated amount of revenue at the Commission's rate appears from a simple calculation, applying the rate of return to the rate base after the annual allowance for depreciation. In the Commission's procedure there was no lack of the due process required by the Federal Constitution. *Railroad Commission of California* v. *Pacific Gas & Electric Co.*, 302 U. S. 388; *Los Angeles Gas Co.* v. *Railroad Commission*, 289 U. S. 287, 304, 305; *West Ohio Gas Co.* v. *Public Utilities Comm'n (No. 1)*, 294 U. S. 63, 70.

With respect to the proceedings in the state courts, appellant urges that the case was not tried and determined as required by state law, and we are referred to the state statutes and the decisions of the Texas courts as to the proper procedure in the trial court and on appeal. It is not our function, in reviewing a judgment of the state court, to decide local questions. We are concerned solely with asserted federal rights. The final judgment of the state court in the instant case must be taken as determining that the procedure actually adopted satisfied all state requirements. *John* v. *Paullin*, 231 U. S. 583, 585; *Lee* v. *Central of Georgia Ry. Co.*, 252 U. S. 109, 110; *Central Union Co.* v. *Edwardsville*, 269 U. S. 190, 194, 195.

As to the requirement of due process under the Federal Constitution, appellant contends that it was denied the independent judicial judgment upon the facts and law to which it was entitled. See *Ohio Valley Water Co.* v. *Ben Avon Borough*, 253 U. S. 287; *Bluefield Water Works Co.* v. *Public Service Comm'n*, 262 U. S. 679; *State Corporation Comm'n* v. *Wichita Gas Co.*, 290 U. S. 561, 569; *St. Joseph Stock Yards Co.* v. *United States*, 298 U. S. 38, 49. The proceeding in the state court undoubtedly purported to afford an independent judicial review. As the Court of Civil Appeals of Texas said in the instant case, the

trial of the issues whether the rate was unreasonable or confiscatory was *"de novo."* Appellant itself recognizes that the trial "was essentially *de novo,* new and full testimony being introduced as to property value, depreciation reserve accrual, revenues, expenses, rates of return, etc." Appellant's evidence was received by the trial court and appellant's contentions were heard. The question whether due process in the court's procedure was accorded thus comes to the mode of trial; that is, (1) the propriety of a trial by jury, and (2) the manner in which the issues were submitted to the jury.

We do not fail to appreciate the difficulty in presenting to a jury the complicated issues in a rate case, especially where, as here, the evidence is voluminous, embracing the conflicting valuations of experts and a host of details in appraisals and in accounts of operations, with elaborate tabulations. Even in trials of such cases without a jury the service of a special master for the analysis of the details in evidence with respect to values and return has been found advisable. We have had abundant occasion to become familiar with the difficulty of such determinations. But we are not dealing with questions of policy as to procedure. The State is entitled to determine the procedure of its courts, so long as it provides the requisite due process. And on that question we have never held that it is beyond the power of the State to provide for the trial by a jury of questions of fact because they are complicated. Cases at law triable by a jury in the federal courts often involve most difficult and complex questions, as, for example, in patent cases at law presenting issues of validity and infringement. See *Tucker* v. *Spalding,* 13 Wall. 453, 455; *Keyes* v. *Grant,* 118 U. S. 25, 36, 37; *Royer* v. *Schultz Belting Co.,* 135 U. S. 319, 325; *Coupe* v. *Royer,* 155 U. S. 565, 578, 579. Most difficult questions of fact in protracted trials, with much conflicting expert testimony, are not infrequently presented in criminal cases triable by jury. The issue of life or death may be

decided in such a case. We have held that a State may modify a trial by jury or abolish it altogether, *Walker* v. *Sauvinet*, 92 U. S. 90; *Maxwell* v. *Dow*, 176 U. S. 581; *Frank* v. *Mangum*, 237 U. S. 309, but never that the time-honored method of resolving questions of fact by a jury must be abandoned by a State under compulsion of the Federal Constitution. And we find no warrant for such a ruling now.

The question remains as to the manner in which the instant case was submitted to the jury. The special issue was submitted whether the Commission's rate was "unreasonable and unjust as to defendant." This submission, under the court's instruction in relation to the import of the phrase "unreasonable and unjust," covered, as appellant conceded at this bar, the issue whether the rate was confiscatory. Appellant did not ask to have the issue of confiscation submitted by the use of that precise term. The question then is as to the denial of the submission of the particular issues which appellant requested and as to the character of the instructions given by the trial court.

The special issues which appellant requested were for findings as to the value of component parts of appellant's property during the years 1932 and 1933 and as to the amounts necessary to cover material and supplies, working capital, going value, and certain other items. It will be observed that these special issues did not embrace all the questions which the jury should consider, as for example, the questions of operating revenues, operating expenses and return for the period to which the evidence before the Court appropriately related and not simply for the years 1932 and 1933. If trial by jury was permissible, as we hold it was, we cannot say—putting aside questions of correct practice under the state law not reviewable here—that appellant was entitled under the Federal Constitution to have special issues framed and submitted to the jury, much less that appellant could demand that the particu-

lar items it mentioned should be singled out and specially passed upon. We consider that question in the light of the total power which the State possesses to provide for jury trials, and for the manner of conducting them, and not with respect to any alleged limitations imposed by state statutes. See *Castillo* v. *McConnico,* 168 U. S. 674, 683.

We have stated at some length, and need not repeat, the general instructions given by the trial court. The jury were instructed as to the right of appellant to receive a fair return on the fair value of its property that is used and useful in the public service and that the jury should take into consideration all elements of value that had been introduced in evidence, including the reproduction cost new of the property and the amount of going value, if any, that inhered in it. The court defined the terms that it used, such as "fair return," "fair value," "used and useful," "operation expenses," "annual depreciation," "reproduction cost new" and "going value," and the court explained what would constitute an adequate rate of return. No instructions were given which could be taken in any sense to conflict with appellant's federal right; on the contrary, the jury, if it duly followed the instructions, could not but enforce that right.

Appellant, while objecting to the charge upon grounds that are not impressive, did not submit and request amplified instructions which might have aided the jury's consideration. Appellant was apparently content to object to the pertinent instructions that were given, and to a general charge, and to stand upon its limited requests as to special issues.

Upon such a record we are unable to hold that there was a denial of federal right so far as procedural due process is concerned.

*Second.—The question of confiscation.*—We have said that our inquiry in rate cases coming here from a state

court "is whether the action of the state officials in the totality of its consequences is consistent with the enjoyment .by the regulated utility of a revenue something higher than the line of confiscation." *West Ohio Gas Co.* v. *Public Utilities Comm'n (No. 1), supra.* This Court will review the findings of fact by a state court (1) where a federal right has been denied as the result of a finding shown by the record to be without evidence to support it, and (2) where a conclusion of law as to a federal right and findings of fact are so intermingled as to make it necessary, in order to pass upon the federal question, to analyze the facts. *Kansas City Southern Ry. Co.* v. *Albers Commission Co.,* 223 U. S. 573, 591; *Northern Pacific Ry. Co.* v. *North Dakota,* 236 U. S. 585, 593; *Norfolk & Western Ry. Co.* v. *Conley,* 236 U. S. 605, 609, 610; *Aetna Life Insurance Co.* v. *Dunken,* 266 U. S. 389, 394. We make that analysis, not to determine issues of fact arising on conflicting testimony or inferences, and thus to usurp the function of the state court as a trier of the facts, but to perform our own proper function in deciding the question of law arising upon the findings which the evidence permits. *Kansas City Southern Ry. Co.* v. *Albers Commission Co., supra.*

Here, the issues of fact were determined in the trial court. Counsel agree that under the state practice the Court of Civil Appeals had no authority to make findings of fact. "Where the evidence is without conflict, it may render judgment. But where there is any conflict in the evidence on a material issue, it has no authority to substitute its findings of fact for those of the trial court." *Post* v. *State,* 106 Tex. 500, 501; 171 S. W. 707. The Court of Civil Appeals held not only that appellant had failed to make good its claim that it was entitled to judgment in its favor but that, having regard to the presumption in favor of the Commission's rate order and the clear and satisfactory proof required to overcome such pre-

sumption, appellant's evidence was insufficient as matter of law to show that the Commission's rate was confiscatory. The reasoning of the Court of Civil Appeals was directed to the decision of those legal questions. Upon the issue of confiscation, the judgment of the trial court was affirmed and thus its finding of fact was not disturbed.

Separate questions are presented (1) as to the value of appellant's property and (2) as to its return from operations. As to the first, the Commission found the value to be $885,000. But the Commission stated that this valuation included property which was neither used nor useful. If it be assumed that the Commission in the exercise of its legislative discretion might include that property in fixing a "reasonable rate," still appellant would not be entitled to its inclusion on the issue of confiscation. While the evidence as to value was conflicting, we are unable to conclude that there was not adequate evidence to sustain a finding that the total property used and useful, after making deductions for the portions not of that sort, was worth not more than $750,000.

Appellant complains that the Court of Civil Appeals based its conclusion upon a valuation of "$700,000" which appellant contends is inadmissible, and that the appellate court misapplied the rule as to the burden of proof in holding that the value must be "pared down unsparingly" to that amount. But we must distinguish "between what was said and what was done," between "dictum and decision," between reasoning and conclusion. *Dayton Power & Light Co.* v. *Public Utilities Comm'n,* 292 U. S. 290, 298, 302. What the appellate court did was to affirm the judgment of the trial court and if, as we think, a valuation of appellant's property at $750,000 would have adequate support in the evidence, we need go no further in relation to that part of the case.

With respect to return from operations, the crucial question is whether appellant was entitled to have the rate for the future fixed with sole regard to the result of operations in the years 1932 and 1933, as appellant contends, or it was permissible to fix the rate upon a consideration of the returns for a number of years, that is, for the four years prior to July 31, 1932, as taken by the Commission, or for that period and the years 1932 and 1933, as shown by the evidence before the trial court. The Commission held its hearing in the latter part of 1932 and made its order in June, 1933. Apart from the question raised by the retrospective feature of its order, we think it manifest that in fixing its rate for the future the Commission was not limited to the results of operations for the year ending July, 1932. Not only was that but a single year, but the Commission regarded it as an abnormal year and the propriety of its ruling in that respect is supported by common knowledge of economic conditions at that time. Similarly, the trial court, sitting in the spring of 1934, was not bound to limit its vision to the results of 1932 and 1933. What would happen in the future was necessarily a matter of prophecy. The Commission's rate had not been put into effect and in estimating what would be the consequence of the requirement the court was entitled to a reasonable basis for prediction, especially in view of a contemplated emergence from a period of extreme depression. As the Court of Civil Appeals observed, the way was open to the appellant to seek a change in the rate on proof of actual experience. Of course, appellant was entitled to take its chances on appellate review of the trial court's judgment, but it cannot complain of the delay incident to that review and its case must be judged as it stood before the trial court. We hold that there was no error in taking into consideration the results of appellant's operations for the years 1929 to 1933, inclusive, according to the evidence produced in the

trial court, and in determining the issue of confiscation in the light of the average return thus shown.

Appellees introduced evidence tending to show that appellant's operating revenues, calculated on the basis of the 55 cent rate and after deducting the operating expenses deemed to be allowable and the annual allowance for depreciation, for the years ending June 30, 1929, 1930, and 1931, and July 31, 1932, yielded net amounts of $106,815.36, $123,293.02, $91,554.04, and $48,556.88, respectively, and for the year 1933, $46,371.85. Appellant contends that on the basis of the 55 cent rate its net operating revenue for 1932 would have been but $10,086.25, and for 1933, $18,408.39. We do not think it necessary, so far as concerns the validity of the Commission's rate in its prospective application, to extend this opinion by stating in detail the contentions *pro* and *con* as to these estimates, questions which largely relate to the permissible allowances for operating expenses. We are satisfied that if we consider the results of appellant's operations for the entire period, 1929 to 1933, the evidence was adequate to support the judgment of the trial court.

*Third.*—With respect to the question of the validity of that part of the Commission's order which made its rate retroactive to January 1, 1932, considered in the light of the evidence relating to the intervening period and of the bond given on the appeal to the Commission from the City's ordinance, this Court is equally divided and the judgment of the Court of Civil Appeals in that relation is accordingly affirmed.

*Judgment affirmed.*

MR. JUSTICE REED took no part in the consideration and decision of this case.

MR. JUSTICE BLACK, concurring.

Although I concur in sustaining the judgment of the court below, I do not agree that the rights of this Delaware corporation doing business in Texas are derived from the

Fourteenth Amendment [1] or that the Fourteenth Amendment deprives Texas of its constitutional power to determine the reasonableness of intra-state utility rates in that State.

Even applying the Fourteenth Amendment under the prevailing doctrine, I do not believe that this Court (apart from procedural questions) is called upon to do more than determine the sole question of confiscation. Any indication by this Court of the value of the company's property will unjustifiably affect and control subsequent valuations for rate making purposes.[2]

` The record discloses a striking absence of satisfactory evidence of the actual cost of the company's properties; its funded indebtedness; the actual investments of stockholders in the company; profits in past years; and the percentage of past profits to actual investment. These matters have important bearing upon the issue of confiscation. There is evidence that only a part of the company's depreciation reserve, accumulated over and above expenditures for repairs and property maintenance, reaches approximately $500,000—or over 40% to 70% of the various estimated values of all the company's assets. In addition appellant has not shown beyond a reasonable doubt that there is an actual investment of stockholders—over and above the amount of borrowed capital—which could be confiscated.[3] Appellant has obviously failed to establish all the elements necessary to prove beyond a reasonable doubt [4] that the rate fixed by the State will result in confiscation of its property.

---

[1] See dissent filed in *Connecticut General Life Ins. Co.* v. *Johnson, ante,* p. 83.

[2] See *McCardle* v. *Indianapolis Water Co.,* 272 U. S. 400; *McCart* v. *Indianapolis Water Co.,* 302 U. S. 419; 13 F. Supp. 110; 89 F. (2d) 522, 525, 526.

[3] Cf. *Chicago & G. T. Ry. Co.* v. *Wellman,* 143 U. S. 339; see dissent in *McCart* case, *supra.*

[4] Cf. *San Diego Land Co.* v. *National City,* 174 U. S. 739, 754; *Ogden* v. *Saunders,* 12 Wheat. 213, 270.

OPERATING EXPENSES.—The record shows that appellant is one of many corporate associates and affiliates connected with the Electric Bond and Share Company and the United Gas System. Practically all operating expenses appeared as inter-company charges among these associates, affiliates, etc. Under these circumstances confiscation cannot be established merely by proof that the books of appellant show alleged expenditures purporting to have been made by or through its affiliates, associates, etc. The strong presumption of the validity of these rates—fixed by a State—can be overcome only by proof that each expenditure, alleged to have been made or incurred by or through an associate or affiliate, was in fact so made or incurred and was fair and reasonable. Such proof was not made in this case. As an illustration, a witness testifying for the City said that it was impossible for him to ascertain proper operating expenses for the year 1933, because his examination was confined to the South Texas Border Gas Company and the South Texas Gas Company "and all I saw in support of these items was inter-company invoices, and I was not able or had no way of determining whether items were proper or not."

Since the major part of appellant's income is absorbed by associated companies in the name of "operating expenses" and by intercorporate transactions, the operations and expenses of these associates, affiliates, etc., are brought within the field of inquiry. Referring to intercorporate transactions of holding companies, subsidiaries, associates, affiliates, etc., this Court has said:

"It is urged that as these averments were uncontradicted they constitute, when taken with the facts previously stated, a *prima facie* case for the reasonableness of the rate charged. This might well be true were it not for the fact of unity of ownership and control of the pipe line and the distribution system. An averment of negotiation and effort to procure a reduction in the wholesale rate

means little in the light of the fact that the negotiators are both acting in the same interest,—that of the holding company which controls both. All of these facts so averred in the pleadings would be far more persuasive with respect to the propriety of the rate *if the parties were independent of each other and dealing at arm's length.* Where, however, they cônstitute but a single interest and involve the embarkation of the total capital in what is in effect one enterprise, *the elements of double profit and of the reasonableness of inter-company charges must necessarily be the subject of inquiry and scrutiny before the question as to the lawfulness of the retail rate based thereon can be satisfactorily answered.*

". . . The argument is made that the proofs demanded by the Commission will involve an extensive and unnecessary valuation of the pipe-line company's property and an analysis of its business, and that this burden should not be thrown upon appellant. Whether this is so we need not now decide. It is enough to say that in view of the relations of the parties, and the power implicit therein arbitrarily to fix and maintain costs as respects the distributing company which do not represent the true value of the service rendered, *the state authority is entitled to a fair showing of the reasonableness of such costs, although this may involve a presentation of evidence which would not be required in the case of parties dealing at arm's length and in the general and open market, subject to the usual safeguards of bargaining and competition.*" [5]

[5] *Western Distributing Co.* v. *Public Service Comm'n,* 285 U. S. 119, 126, 127.

"Purchases are frequently made by a member or members of a system from affiliates or subsidiaries, and with comparative infrequency from strangers. At times obscurity or confusion has been born of such relations. There is widespread belief that transfers between affiliates or subsidiaries complicate the task of rate-making for regulatory commissions and impede the search for truth. *Buyer*

Not only did appellant fail to prove the reasonableness of its intercompany dealings, but it did not—as requested in open court—produce a *full* list of salaries paid by its associates, affiliates, etc. It is true that evidence did show that *some* of the officers of associates, affiliates, etc., received from $65,000 to $100,000 a year but there was no proof of the reasonableness of such salaries or of their effect upon appellant's local gas distribution expenses.

This Court has previously declared the importance of salaries in determining the question of confiscation in *Chicago & G. T. Ry. Co.* v. *Wellman,* 143 U. S. 339, 345. There it was said:

"Of what do these operating expenses consist? Are they made up partially of extravagant salaries; fifty to one hundred thousand dollars to the president, and in like proportion to subordinate officers? Surely, before the courts are called upon to adjudge an act of the legislature fixing . . . maximum . . . rates for railroad companies to be unconstitutional, . . . they should be fully advised as to what is done with the receipts and earnings of the company. . . . While the protection of vested rights of property is a supreme duty of the courts, it has not come to this, that the legislative power rests subservient to the discretion of any railroad corporation which may, by exorbitant and unreasonable salaries, or in some other improper way, transfer its earnings into what it is pleased to call 'operating expenses.' "

When a public utility chooses to pay out a large part of its "operating expenses" to corporate associates, affiliates, etc., these payments might conceivably be used to

*and seller in such circumstances may not be dealing at arm's length, and the price agreed upon between them may be a poor criterion of value. Dayton Power & Light Co.* v. *Public Utilities Comm'n of Ohio,* 292 U. S. 290, 295; *Western Distributing Co.* v. *Public Service Comm'n of Kansas,* 285 U. S. 119; *Smith* v. *Illinois Bell Telephone Co.,* 282 U. S. 133." *American Telephone & Telegraph Co.* v. *United States,* 299 U. S. 232, 239.

drain the operating company's income and to inflate the "operating expenses." Inflated operating expenses inevitably lead to inflated rates. Since affiliates, associates, etc., do not ordinarily deal at "arm's length" appellant had the burden of proving the fairness and reasonableness of all expenditures made or charged as inter-company transactions.

DUE PROCESS AND TRIAL BY JURY.—Appellant contended in the court below that *"the submission of this case . . . to a jury will deprive this defendant of that character of hearing and trial contemplated under the Constitution and laws of the United States and of the Constitution and laws of the State of Texas."* Appellant here further insists that over appellant's protest, the court below did submit the cause to a jury *"Despite the recognized inability of such a body to deal adequately with proof of that nature . . . , despite appellant's vigorous protest and efforts to extricate itself from this situation . . ."*

The Constitution of the United States does not prohibit trial by jury, but the Seventh Amendment, judicially construed as a limitation on the federal government,[6] provides:

"In Suits at common law, where the value in controversy shall exceed twenty dollars, *the right of trial by jury shall be preserved,* and no fact tried by a jury shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."

This Court said in 1855 [7] that "The words, 'due process of law,' were undoubtedly intended to convey the same meaning as the words, 'by the law of the land' in *Magna Charta."* Again this Court said: [8]

---

[6] *Barron* v. *Baltimore,* 7 Pet. 243, 247; *Edwards* v. *Elliott,* 21 Wall. 532, 557.

[7] *Murray's Lessee* v. *Hoboken Land & Imp. Co.,* 18 How. 272, 276.

[8] *Thompson* v. *Utah,* 170 U. S. 343, 349, 350.

"When Magna Charta declared that no freeman should be deprived of life, etc., *'but by the judgment of his peers or by the law of the land,'* it referred to a trial by twelve jurors. Those who emigrated to this country from England brought with them this great privilege 'as their birthright and inheritance, . . .' . . . 'The trial . . . by a jury of one's country, is justly esteemed one of the principal excellencies of our Constitution; for what greater security can any person have in his life, liberty or estate, than to be sure of not being divested of, or injured in any of these, without the sense and verdict of twelve honest and impartial men of his neighborhood? . . .' "

There is nothing in the letter or spirit of our Constitution or any constitutional amendment, which deprives a state of the right to submit issues of fact to a trial by jury. That Constitution indicates no preference for determination of facts by judges or masters appointed by judges. On the contrary, our Federal Constitution, the State Constitutions, and our national tradition demonstrate a well-established preference for trial by jury.

"One of the objections made to the acceptance of the Constitution as it came from the hands of the Convention of 1787 was that it did not, in express words, *preserve the right of trial by jury,* and that under it, *facts tried by a jury could be reëxamined by the courts of the United States* otherwise than according to the rules of the common law. The Seventh Amendment was intended to meet these objections, *and to deprive the courts of the United States of any such authority."* [9]

Further, "Upon the reasoning in the case just referred to [*The Justices* v. *Murray,* 9 Wall. 274, 278] it would seem to be clear that the last clause of the Seventh Amendment *forbids the retrial by this court* of the facts tried by the jury in the present case. . . .

---

[9] *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226, 243.

". . . Even if we were of opinion in view of the evidence that the jury erred in finding that no property right, of substantial value in money, had been taken from the railroad company, by reason of the opening of a street across its right of way, *we cannot, on that ground, reëxamine the final judgment of the state court. We are permitted only to inquire whether the trial court prescribed any rule of law for the guidance of the jury that was in absolute disregard of the company's right to just compensation.*" [10]

This cause was tried in the courts of Texas in accordance with regular court procedure applicable to such cases. The facts were submitted to a jury as provided by the constitution and laws of that State, and in harmony with the traditions of the people of this nation. Under these circumstances, no proper interpretation of the words "due process of law" contained in the Fourteenth Amendment, can justify the conclusion that appellant has been deprived of its property contrary to that "due process." In October, 1877, this Court in *Davidson* v. *New Orleans,* 96 U. S. 97, 105—in discussing the Fourteenth Amendment—said:

"But however this may be, or under whatever other clause of the Federal Constitution we may review the case, it is not possible to hold *that a party has, without due process of law,* been deprived of his property, when, as regards the issues affecting it, *he has, by the laws of the State, a fair trial in a court of justice, according to the modes of proceeding applicable to such a case.*"

I concur in the affirmance.

Separate opinion of MR. JUSTICE MCREYNOLDS and MR. JUSTICE BUTLER.

MR. JUSTICE BUTLER and I are of opinion that the judgment under review should be reversed. We adhere to the

---

[10] *Id.*, 244, 246.

doctrine announced in *Ohio Valley Co.* v. *Ben Avon Borough,* 253 U. S. 287, and often reaffirmed. When rates fixed for a public service corporation by an administrative body are alleged to be confiscatory the Federal Constitution requires that fair opportunity be afforded for submitting the controversy to a judicial tribunal for determination upon its own independent judgment both as to law and facts. Here such opportunity has been denied.

June 13, 1933, the Texas Railroad Commission directed appellant to observe a new schedule of rates. By bill presented to the United States District Court June 29, 1933, appellant challenged this action as confiscatory. July 26, 1933, the Commission began this proceeding in the state court by filing an original petition which, among other things, alleged—

"Notwithstanding defendant's remedies are adequate and complete in the courts of this State, and notwithstanding every constitutional and legal right to which it may be entitled is and will be fully safeguarded and protected in said court, the defendant, nevertheless, elected to and did, on or about the 29th day of June, 1933, file its bill of complaint in the District Court of the United States for the Southern District of Texas, Laredo Division, in a cause entitled, United Gas Public Service Company, plaintiff *v.* Lon A. Smith, et al., defendants, No. 32 in Equity, and being a cause wherein your defendant is plaintiff and wherein each and all of your plaintiffs are defendants, except the State of Texas. . . ."

"In said action in said United States District Court, United Gas Public Service Company alleges in substance and effect that the order entered by the Railroad Commission of Texas fixed and prescribed a rate confiscatory of its property used and useful in the public service, and alleged that said order is unconstitutional and upon said allegation [obtained] a temporary restraining order out of said court enjoining and restraining your plaintiffs and

each of them (except the State of Texas) from compelling or attempting to compel your defendant to observe said order of said Commission."

"Plaintiffs allege that the defendant is attempting to evade the laws of this State and the lawful order of the Railroad Commission of Texas fixing and prescribing rates and charges for the distribution and sale of natural gas within the limits of the City of Laredo, and that in charg-- ing a rate in excess of that prescribed by the Railroad Commission, plaintiffs herein, and each of them, are suffering irreparable injury, and that there is no adequate remedy prescribed by the laws of this State which will protect the public interest involved and the rights of plaintiffs herein."

"Plaintiffs are desirous of having the constitutional questions involved in the attack being made by United Gas Public Service Company upon the Commission's order heard and determined in the courts of this State, and to that end desire this court to enter a stay of proceedings in accordance with the provisions of Section 38 [380 *], Title 28, U. S. C. to the end that all proceedings in the district courts of the United States will be stayed pending a final determination of this cause in the courts of this State."

---

* Sec. 380, Title 28 U. S. C. ". . . It is further provided that if before the final hearing of such application [to a federal court for injunction] a suit shall have been brought in a court of the State having jurisdiction thereof under the laws of such State, to enforce such statute or order, accompanied by a stay in such State court of proceedings under such statute or order pending the determination of such suit by such State court, all proceedings in any court of the United States to restrain the execution of such statute or order shall be stayed pending the final determination of such suit in the courts of the State. Such stay may be vacated upon proof made after hearing, and notice of ten days served upon the attorney general of the State, that the suit in the State courts is not being prosecuted with diligence and good faith. . . ."

"This action is filed in this court in the nature of an appeal under the terms of Article 6059, Revised Civil Statutes, but such appeal is not taken because the plaintiffs herein are dissatisfied with the rates and charges prescribed in the Commission's said order, but primarily for the purpose of protecting the jurisdiction of this Court and its venue to hear and finally determine the matters in controversy and to enforce the said order, if it should be determined to be valid upon final hearing."

The petition asked: That the defendant appear and answer; that upon final trial the plaintiffs have an appropriate judgment; that defendant be enjoined from charging any rates other than those fixed by the Commission; also that an order issue staying further proceedings by the Commission pending the termination of this suit, &c.

July, 26, 1933, the state court entered a stay order as prayed. August 17, 1933, upon the Commission's application, the United States District Court ordered that all proceedings in that court be stayed, pending final action by the state court.

Under the compulsion indicated, appellant unwillingly appeared in the state court and filed an answer setting up its rights under the Federal Constitution. The matter was supposed to stand in that court for hearing *de novo*. Voluminous evidence was presented by both sides.

Notwithstanding appellant's definite objections and its duly presented requests for adequate instructions, a single issue was submitted to the jury. "Do you find that the order of the Railroad Commission of Texas bearing date June 13, 1933, providing for a fifty-five cent gas rate to residential consumers within the city of Laredo, Texas, under the facts introduced in evidence before you, is unreasonable and unjust as to defendant, United Gas Public Service Company? Answer this question 'Yes,' or 'No.'" The jury answered "No," and judgment affirming the Commission's order in part was entered.

The Court of Civil Appeals took the cause for review upon the record made in the District Court. The following excerpts from its opinion sufficiently indicate the reasons which moved it partly to sustain and partly to overrule the judgment of the trial court and finally to approve the Commission's action *in toto*.

"We have reached the conclusion that appellant not only failed to establish its claim for reversal and rendition of judgment in its favor, but that when viewed in the light of the presumption in favor of the validity of the Commission's rate order, and of the quantum and character of proof required to overcome such presumption, the evidence adduced was insufficient, as a matter of law, to show that the 55¢ rate order was either unjust and unreasonable or confiscatory. In view of this conclusion, all questions of practice presented in 'Part II.' of the brief go out of the case."

"In absence of an actual test of the rate, the court on appeal must resolve all doubts against the complaining party; pare down valuations unsparingly; and the rate must appear to be clearly confiscatory, or unjust and unreasonable before the court should by injunction restrain its enforcement in advance of actual experience of the practical results of the rate."

"That in advance of any actual test of the practical result of the new rate, the court on appeal will not disturb the rate where it is based upon conflicting evidence as to valuations of property, or as to any other item used as a basis for the calculation of the rate; because to do so would merely substitute the findings of the court or jury upon conflicting evidence for that of the Commission, and would therefore permit the court to exercise the legislative function of rate-making. R. R. Commission *v.* Shupee, 57 S. W. (2d), 295; affirmed 73 S. W. (2d), 505. And that by 'resolving all doubts against' the appellant, 'and using valuations pared down unsparingly,' there could

have been no reasonable doubt in the judicial mind that the 55¢ rate was neither confiscatory nor unjust and unreasonable. Newton *v.* Consolidated Gas Co., 258 U. S., 165."

Considering the rules which the Court of Civil Appeals declared applicable to the trial, quite evidently appellant had no adequate opportunity to submit the law and facts relevant to the controversy to a fair judicial tribunal for determination according to its own independent judgment.

A tribunal required to accept weighty presumptions against a defendant, resolve all doubts against it, pare down valuations to the utmost and refuse a judgment in its favor when the evidence is conflicting as to valuations or other important elements, could not reach an independent judgment in respect of the law and facts—could not arrive at a fair judicial determination. To us the proceedings in the state courts seem an empty show.