**PACIFIC GAS & ELECTRIC CO. v. RAIL-
ROAD COMMISSION OF CALI-
FORNIA et al.**

No. 3660–S.

District Court, N. D. California, S. D.

Sept. 8, 1938.

On Rehearing Feb. 9, 1939.

510

Thomas J. Straub, Ralph W. DuVal, Warren Olney, Jr., Allan P. Matthew, Robert L. Lipman, and McCutchen, Olney, Mannon & Greene, all of San Francisco, Cal., for plaintiff.

Arthur T. George, Ira H. Rowell, and Roderick B. Cassidy, all of San Francisco, Cal., for defendant Railroad Commission.

Before WILBUR, Circuit Judge, and ST. SURE and LOUDERBACK, District Judges.

WILBUR, Circuit Judge.

This action was brought by the Pacific Gas and Electric Company, hereinafter called the Company, to enjoin the operation of rates fixed by the California Railroad Commission, hereinafter called the Commission, for the use of gas in the City and County of San Francisco and vicinity. Two claims are made in the bill of complaint, one that the Commission had denied due process of law in fixing the rates, and the other that the Company was denied just compensation for the use of its property by the new rates.

A three-judge court was organized to hear the application for a temporary injunction, as required by law. 28 U.S.C.A. § 380. The matter was referred to a Special Master for report. Upon the hearing of the exceptions to his report, this court concluded that the refusal of the Commission to consider any evidence with relation to the cost of reproduction new of the property of the Gas Company was an arbitrary refusal to consider evidence with respect to the value of the property which the Supreme Court had declared essential to a proper determination of the question of value and confiscation. D.C., 13 F.Supp. 931; D.C., 16 F.Supp. 884. We therefore found it unnecessary to pass upon the question of confiscation in view of our conclusion as to denial of due process of law in the fixing of rates. Appeal was taken to the Supreme Court which on rehearing reversed our decision and remanded the case to this court for further proceedings in accordance with the opinion, 302 U.S. 388, 58 S.Ct. 334, 82 L.Ed. 319.

The parties have furnished stipulated supplementary proof as to income and expenses and have filed additional briefs to supplement their briefs filed before the Special Master, and those before the court on exceptions to the Special Master's report. It thus becomes our duty to determine whether or not the rates fixed by the Commission were confiscatory for the years 1934, 1935 and 1936, in that they denied the plaintiff an opportunity to obtain a fair return upon the fair value of its property. It has been stipulated that our findings should cover each year in which the rates were effective, estimated upon the same rate base as is found to be correct for the year 1934. That is to say, the change in capital investment during the period from 1934 to 1936 is agreed to be negligible.

In April 1936, during the progress of this litigation, the plaintiff consented to the reduction of the rates. Consequently, the prayer for a permanent injunction has been abandoned and the sole remaining question is as to the distribution of the fund resulting from the collection by the Company

for gas at the old rates, as permitted by the temporary injunction.

It appears from the report of the Special Master that he concluded that the historical cost of the property found by the Commission to be a reasonable rate base was not such and on the evidence before him determined that the proper basis for determining the fair value of the property of the Company was the "reproduction cost new" of the property less accrued depreciation. Thus the Commission rejected the evidence of reproduction cost new and based its determination of the fair value of the property almost exclusively upon the historical cost of the property, while the Special Master rejected historical cost as evidence of value and took the exact figures of the Company's estimate of reproduction cost new, less depreciation, as fixing the fair value of its property.

■ The decisions of the Supreme Court are uniform to the effect that both these elements should be considered in arriving at the fair value of the property. The composite result of such consideration, it is thus decided, will be more nearly fair to the utility and to the public than a rate base fluctuating with every turn of the market value of supplies and the cost of labor. In the case at bar (Railroad Commission v. Pacific Gas & Electric Co., 302 U.S. 388, 58 S.Ct. 334, 82 L.Ed. 319) the Supreme Court construed the decision of the Commission as a finding that the historical cost of the property, undepreciated, was the fair value of the Company's property upon which it was entitled to a fair return. We quote from the opinion in that regard as follows [page 340]:

"In the instant case we cannot say that the Commission in taking historical cost as the rate base was making a finding without evidence and therefore arbitrary. * *

"The Commission specifically found what it considered to be the rate base. 39 Cal.R.Com.Rep., supra, p. 76. The Commission found that rate base to be reasonable. Cal.R.Com.Rep. [supra] p. 77, note. The import of its opinion is that the rate base represented the Commission's conclusion as to the value which should be placed upon respondent's property for the purpose of fixing rates."

■ The Court also clarified our duty in the premises by holding that the findings of the Commission must be sustained unless overcome by convincing proof. The Court stated:

"There is a further contention as to the burden of proof. But the applicable rule is clear. Respondent is in a federal court complaining of the constitutional invalidity of state made rates and respondent is held to the burden of showing that invalidity by convincing proof. Los Angeles Gas Corp. v. Railroad Commission, supra, 289 U.S. 287, at page 305, 53 S.Ct. 637, 643, 77 L.Ed. 1180; Lindheimer v. Illinois Bell Telephone Co., supra, 292 U.S. 151, at page 169, 54 S.Ct. 658, 665, 78 L.Ed. 1182; Dayton Power & Light Co. v. Public Utilities Commission, 292 U.S. 290, 298, 54 S.Ct. 647, 651, 78 L.Ed. 1267." Railroad Commission v. Pacific Gas & Elec. Co., 302 U.S. 388, 58 S.Ct. 334, 341, 82 L.Ed. 319.

■ An examination of the cases thus cited by the Supreme Court in support of the rule as to the burden of proof, and of other cases since decided, indicates more fully the duty of this court in approaching and disposing of the problem. While it is quite true that the federal courts, in determining questions of confiscation in violation of the Fourteenth Amendment, U.S.C.A.Const. Amend. 14, exercise their own independent judgment as to the facts and may disagree with the factual conclusions of the rate fixing body, it cannot disregard such findings. It has become clearer in later decisions of the Supreme Court that due respect must be paid to the judgment of the rate making body where its conclusion of fact must necessarily result from the exercise of its judgment upon conflicting evidence. While in a technical sense the court, in considering a rate alleged to be confiscatory exercises its own independent judgment on both the facts and the law, and does not sit as a reviewing court, it is in essence called upon to pass upon the judgment of the rate making body, and some consideration must be given to its decision in the region in which fair and independent judgment may be exercised by those charged with the duty of ascertaining the facts,[1] and where that judgment

---

[1] As stated by the Supreme Court in Ohio Bell Tel. Co. v. Public Utilities Commission, 301 U.S. 292, 304, 57 S. Ct. 724, 730, 81 L.Ed. 1093:

"Regulatory commissions have been in-vested with broad powers within the sphere of duty assigned to them by law. Even in quasi-judicial proceedings their informed and expert judgment exacts and receives a proper deference from courts

has been fairly exercised and the result is reasonable the court sufficiently discharges its duty to exercise its own independent judgment by finding the result arrived at by the rate making body to be reasonable. The finding of the rate making body should always be in focus when the evidentiary facts are considered. This rule is clearly implied in many other recent decisions by the Supreme Court, notably in Los Angeles Gas & Elec. Co. v. Railroad Commission of California, 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180, wherein the three-judge district court and the Supreme Court on review, analyzed the findings of the Railroad Commission of California, and determined whether or not such findings were reasonable and supported by evidence, and in exercising its own independent judgment sustained the conclusion of the Commission that although it had expressly declined to give a specific valuation to the element of "going concern value" of the utility's property as a part of the rate base it had nevertheless given a substantial recognition thereof in its valuation. Dayton Power & Light Co. v. Public Utilities Comm., 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267; see also, Denver Union Stock Yard Co. v. U. S., 304 U.S. 470, 58 S.Ct. 990, 82 L.Ed. 1469. In Lone Star Gas Co. v. State of Texas, 304 U.S. 224, 58 S.Ct. 883, 82 L.Ed. 1304, it was held that the utility company was entitled to attack the findings of the Texas Railroad Commission on the same basis as that on which they were made. See also, United Gas Public Service Co. v. Texas, 303 U.S. 123, 625, 58 S.Ct. 483, 493, 82 L.Ed. 702; also, Denver Union Stock Yard Co. v. U. S. supra, 304 U.S. 470, 58 S.Ct. 990, 82 L.Ed. 1469.

In San Diego Land & Town Co. v. National City, 174 U.S. 739, 19 S.Ct. 804, 43 L. Ed. 1154, it is stated that judicial interference is not justified unless "clearly and beyond all doubt * * * the rates prescribed will necessarily have the effect to deny just compensation" [page 810]. In Railroad Commission of Louisiana v. Cumberland Tel. Co., 212 U.S. 414, 29 S.Ct. 357, 53 L.Ed. 577, it is said that the rates established by the Commission were prima facie fair and valid and the burden of showing that they were confiscatory and unreasonable rests upon the complainant. In New York & Queens Gas Co. v. McCall, 245 U.S. 345, 348, 38 S.Ct. 122, 124, 62 L.Ed. 337, it was said that while the court will not analyze the evidence before the Commission to determine where the preponderating weight lies, "yet it will, nevertheless, enter upon such an examination of the record as may be necessary to determine whether the federal constitutional right claimed has been denied." In the case of Los Angeles Gas & Elec. Co. v. Railroad Commission, supra, 289 U.S. 287, 304, 53 S.Ct. 637, 643, 77 L.Ed. 1180, it was said:

"We do not sit as a board of revision, but to enforce constitutional rights. * * The legislative discretion implied in the rate-making power necessarily extends to the entire legislative process, embracing the method used in reaching the legislative determination as well as that determination itself. We are not concerned with either, so long as constitutional limitations are not transgressed. When the legislative method is disclosed, it may have a definite bearing upon the validity of the result reached, but the judicial function does not go beyond the decision of the constitutional question. That question is whether the rates as fixed are confiscatory. And upon that question the complainant has the burden of proof, and the court may not interfere with the exercise of the state's authority unless confiscation is clearly established. * * * We have said that the judicial ascertainment of value for the purpose of deciding whether rates are confiscatory 'is not a matter of formulas, but there must be a reasonable judgment, having its basis in a proper consideration of all relevant facts.' Minnesota Rate Cases, 230 U.S. 352, 434, 33 S.Ct. 729, 754, 57 L. Ed. 1511, 48 L.R.A.(N.S.), 1151, Ann.Cas. 1916A, 18."

The court also quoted from State ex rel. Southwestern Bell Telephone Co. v. Public Service Commission, 262 U.S. 276, 287, 288, 43 S.Ct. 544, 546, 67 L.Ed. 981, 31 A.L.R. 807: "An honest and intelligent forecast

when it has been reached with due submission to constitutional restraints. West Ohio Gas Co. v. Public Utilities Comm. (No. 1), supra, 294 U.S. 63, at page 70, 55 S.Ct. 316, 320, 79 L.Ed. 761; West Ohio Gas Co. v. Public Utilities Comm. (No. 2), 294 U.S. 79, 55 S.Ct. 324, 79 L.

Ed. 773; Los Angeles Gas & Electric Corporation v. Railroad Commission of California, 289 U.S. 287, 304, 53 S.Ct. 637, 643, 77 L.Ed. 1180. Indeed, much that they do within the realm of administrative discretion is exempt from supervision."

of probable future values, made upon a view of all the relevant circumstances, is essential. If the highly important element of present costs is wholly disregarded, such a forecast becomes impossible. * * * But, again, the court has not decided that the cost of reproduction furnishes an exclusive test. * * * We have emphasized the danger in resting conclusions upon estimates of a conjectural character." Quoting from the Minnesota Rate Cases, 230 U. S. 352, 452, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas.1916A, 18, the court said: "It is fundamental that the judicial power to declare legislative action invalid upon constitutional grounds is to be exercised only in clear cases. The constitutional invalidity must be manifest, and if it rests upon disputed questions of fact, the invalidating facts must be proved. And this is true of asserted value as of other facts." The court then proceeds: "The weight to be given to actual cost, to historical cost, and to cost of reproduction new, is to be determined in the light of the facts of the particular case."

The duty of the court in determining the question of confiscation is squarely dealt with by the Supreme Court in St. Joseph Stock Yards Co. v. U. S., 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033, where the District Court in passing upon the confiscatory character of rates fixed by the Secretary of Agriculture declined to go further than to determine whether the Secretary's finding of value was based upon substantial evidence. In this situation the Supreme Court defined the duty resting upon the courts in such a case as follows [page 726]:

"But this judicial duty to exercise an independent judgment does not require or justify disregard of the weight which may properly attach to findings upon hearing and evidence. On the contrary, the judicial duty is performed in the light of the proceedings already had and may be greatly facilitated by the assembling and analysis of the facts in the course of the legislative determination. Judicial judgment may be none the less appropriately independent because informed and aided by the sifting procedure of an expert legislative agency. Moreover, as the question is whether the legislative action has passed beyond the lowest limit of the permitted zone of reasonableness into the forbidden reaches of confiscation, judicial scrutiny must of necessity take into account the

entire legislative process, including the reasoning and findings upon which the legislative action rests. We have said that 'in a question of rate-making there is a strong presumption in favor of the conclusions reached by an experienced administrative body after a full hearing.' Darnell v. Edwards, 244 U.S. 564, 569, 37 S.Ct. 701, 703, 61 L.Ed. 1317. The established principle which guides the court in the exercise of its judgment on the entire case is that the complaining party carries the burden of making a convincing showing and that the court will not interfere with the exercise of the rate-making power unless confiscation is clearly established. Los Angeles Gas & Electric Co. v. Railroad Commission, 289 U.S. 287, 305, 53 S.Ct. 637 [643], 77 L.Ed. 1180; Lindheimer v. Illinois Bell Telephone Co., 292 U.S. 151, 169, 54 S.Ct. 658 [665], 78 L.Ed. 1182; Dayton Power & Light Co. v. Public Utilities Commission, 292 U.S. 290, 298, 54 S.Ct. 647 [651], 78 L.Ed. 1267. * * *"

The findings of the Commission in this case cover the whole range of facts involved in the rate-making process, not only the ultimate conclusion of rate base and return, but also the value of various items of property used and useful to be included in the rate base and upon depreciation, income and expense. Each of these findings, as we understand the decision of the Supreme Court in this case, is presumptively correct.

We, therefore, turn to an examination of the findings of the Commission which are attacked by the Company.

### Going Concern Value.

The Commission, in fixing the rates, made no allowance for going concern value as such. The Company claimed $12,000,000 as an addition to the rate base for going concern value. The testimony of experts was adduced before the Master and he fixed the going concern value at $10,000,000. The theory upon which the Commission denied any addition to the rate base because of going concern value was that the expenditures of the Company necessary to produce the going concern value had been allowed throughout the history of the Company as operating expenses to be deducted from the gross revenue in fixing the rate. The Commission points out that the operating expenses considered by them as proper to be deducted from the gross revenue under the new rate was an allowance of $800,000 for advertisement and

other development expenses incident to expanding the business of the Company. It is, therefore, argued by the Commission that inasmuch as the consumers of gas have already paid the costs incident to the acquisition of going concern value they ought not to be compelled to pay rates upon the capitalization of the results of such expenditures by the addition of going concern value to the rate base.

■ If going concern value were as definite and tangible as money, a complete answer to the contention of the Commission would be found in the decision of the Supreme Court in Board of Public Utility Commissioners v. New York Telephone Co., 271 U.S. 23, 46 S.Ct. 363, 70 L.Ed. 808. There the Company had accumulated a depreciation reserve far in excess of the actual depreciation. These reserves, of course, had come from the rate payers. It was held that the reserve thus acquired belonged to the company regardless of whether or not it was greater or less than the actual depreciation and that the company could not be required to use its funds thus acquired to pay for future depreciation, but that the new rates must take care of the anticipated depreciation of the plant. So, if we assume that the property of the Company has a going concern value of $12,000,000, and apply the principle announced in Board of Public Utility Commissioners v. New York Telephone Co., supra, it would result that it was wholly immaterial whether the going concern value of the Company was paid for out of expenses deductible from gross income and thus derived from the rate payers, or whether it resulted from capital investment by the Company. It seems to be the law, however, that in dealing with so intangible a thing as going concern value it is proper to consider the fact that this value may be the result of expenditures made by the Company derived not from the net income from the property nor from capital, but from amounts claimed and allowed as operating expense. See Idaho Power Co. v. Thompson, D.C., 19 F.2d 547. In this connection the Commission contends, and it is not controverted, that the going concern value of the Company's property is almost entirely the result from expenditures from the gross income over a long period of years during which the Company has been subject to the rate making power of the Commission. These expenditures have averaged yearly more than a quarter of a million dollars ($275,000) for the last four years during which manufactured gas was used, and over three-quarters of a million ($778,992) during the first four years of natural gas use. For the last twenty years (1913–1932, inclusive) the expenditures for the promotion of the gas business have exceeded $5,000,000 ($4,215,688 during the eight years above specified). Assuming that these expenditures have increased the going concern value by the amount thereof, it seems to be recognized that in dealing with the question of confiscation wherein the Company is entitled to a fair return upon the fair value of its property, so much of going concern value resulting from expenditures paid by consumers in addition to a fair rate of return on capital, may be justly disregarded. See discussion in Idaho Power Co. v. Thompson, supra.

■■ The earlier cases on going concern value seem to indicate clearly that going concern value as such should be definitely reflected in the rate base but recent decisions have modified this rule. Of course, if the rate base makes an allowance for capital sufficiently great to include an amount sufficient to cover going concern value as in the Los Angeles Gas & Electric Corporation Case, supra, 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180, it is quite immaterial that going concern value is not allowed eo nomine. But the latest decision of the Supreme Court on going concern value, Denver Union Stock Yard Co. v. U. S., 304 U.S. 470, 58 S.Ct. 990, 82 L.Ed. 1469, holds definitely that going concern value need not be accorded a specific value in the rate base; but more important still that decision holds that if the record shows that the property of the corporation dedicated to the public use is valued as a going concern this is a sufficient recognition of going concern value. The decision is so important and so recent that we quote therefrom at length [page 995]:

"Going Concern Value. Appellant maintains that, while admitting it exists in the property, the Secretary [of Agriculture] failed to include in rate base any allowance on account of it, and that the evidence requires addition of at least $325,000 to cover that element.

"In substance, the Secretary's findings state: The stockyard is a going concern; it has a long history of efficient management and has won a reputation for good service; it has been financially successful. His valuation engineer (whose figures and val-

uation are the basis of the Secretary's appraisal) considered going concern value but did not include a separate amount for it. In adopting the value of the land and the cost of reproduction new less depreciation of structures, consideration was given to the element of going concern value. Adequate allowance has been included, although no separate item on its account has been set forth. The findings contain a 'summary of the value of used and useful land, the cost of reproduction new of structures and equipment, including direct construction overheads, indirect overheads, interest on used and useful land during construction, and working capital, and the cost of these, less depreciation where depreciation exists, of respondent [appellant] as a going concern. * * * It is found that the fair value of the property of respondent as a going concern is $2,792,681.' * * *

"While it may be considered as made up of tangible and intangible elements, it is not necessarily to be appraised by adding to cost figures attributable to mere physical plant something to cover the value of the business. Kennebec Water District v. Waterville, 97 Me. 185, 220, 54 A. 6, 60 L.R.A. 856. Value depends upon use and is measured, or at least significantly indicated, by the profitableness of present and prospective service rendered at rates that are just and reasonable as between the owner of and those served by the property. * * * It is elementary that value of a going concern may be less than, equal to, or more than, present cost of plant less depreciation plus necessary supplies and working capital. See Galveston Electric Co. v. Galveston, 258 U.S. 388, 396, 42 S.Ct. 351, 355, 66 L. Ed. 678; Los Angeles Gas Corporation v. Railroad Commission, supra [pages] 313, 314, 53 S.Ct. [page] 647. Dayton Power & Light Co. v. Utilities Committee, ubi supra. Appellant's plant without business, present or prospective, would be worth much less than the cost figures found by the Secretary to represent value. Appellant's claim, that the rate base includes nothing on account of going concern value, is without foundation in fact.

"* * * * * * *

"None of these considerations has much, if any, bearing on the ascertainment of going value or the application of the rule that it is to be taken into account in confiscation cases. That element is not separate from or necessarily in excess of reasonable cost figures attributable to the plant. The Secretary considered its location, the volume and flow of shipments, percentages of sales to receipts, privileges in transit, cost of service, past history, future prospects, and other pertinent facts. Appellant does not claim that its past operations clearly reflect excellence of service and low cost per unit in comparison with results attained by other stockyards, or that conditions affecting performance give dependable assurance of future growth and capacity to earn net returns at relatively low rates. See e. g. McCardle v. Indianapolis Water Co., supra [272 U.S. 400], 413–415, 47 S.Ct. [144], 149, 150 [71 L.Ed. 316]. Its evidence falls far short of condemning as arbitrary and confiscatory the Secretary's refusal to add a separate amount to his rate base to cover going concern value."

It is clear that the scheme of valuation adopted by the Commission fully recognizes the fact that the property dealt with is that of a going concern and that its separate elements are appraised as such and, consequently, that the value fixed for the property of the Company is as an operative whole and as a going concern. To cite one item only, as illustrative of others, in fixing the value of the gas mains underground, allowance is made not only for the cost of the pipes used for this purpose but for the expense of burying them underground which has been added as a part of the cost of the system. Unless this part of the property is considered and appraised as a part of a going concern it is obvious that the buried pipe is worth as much less than it was before it was buried, as would be the cost of digging it up. So of every appliance of the Company located at its appropriate place in the system the expense of location would decrease the value of the property instead of increasing it unless it is considered as a part of a going concern. It is of course unanimously agreed that the cost of installation of pipe lines and appliances is a proper element to enter into the rate base, whether historic cost or reproduction cost new less depreciation is accepted as such base. The point is that this universally conceded method of evaluation necessarily involves an appraisement of the property as a part of a going concern.

There is, therefore, no doubt that the Commission recognized the going concern value and also that it declined to make a specific allowance therefor in the rate base on the theory that that value was

already reflected in the historic cost and in the rate base deduced therefrom so far as the Company was entitled to have the value considered. However, bearing in mind the long line of cases in which the Supreme Court has held affirmatively that going concern value is property upon which the public utility is entitled to a reasonable return, and also the fact that the decision in each case is based upon the facts of the particular case, it is clear, we think, that the Supreme Court in Denver Union Stock Yard Co. v. U. S., supra, did not hold that the mere appraisal of the specific items of property in the system as a part of a going concern is such full recognition of going concern value as is required by the law as laid down by the Supreme Court. In addition to the difficulties we have already pointed out in considering and estimating going concern value is the fact that there is no definite and certain method of making an appraisement thereof. A percentage on the value of the property is often adopted. It has been suggested that going concern value can be measured by the market value of the plant as a going concern over and above the physical property therein, but as market value has been expressly repudiated as a basis for fixing the fair value of property devoted to public use because it depends upon the rates fixed it will not do to resuscitate the doctrine with reference to this particular item of value. The opinions of experts in this case and in any other as to going concern value must depend in large measure upon the interpretation placed by the expert upon the decisions of the Supreme Court with reference to what elements constitute going concern value, so the opinion is a mixed one of law and fact, and the opinions expressed thereon by experts are not particularly helpful in arriving at a just conclusion and are certainly not conclusive thereon.

The Commission, in its brief, states that "* * * every dollar expended for the maintenance of the property in such splendid condition, the retirement of worn out and obsolete plants, the training of the personnel, as well as all costs of promoting the expansion of the business, have been a charge against consumers out of the operating expense allowed by the Commission in addition to the investor's return."

We cannot say that there is so clear a showing of additional going concern value as would justify us in entirely rejecting the judgment of the Commission thereon.

As stated by the Supreme Court, speaking through the Chief Justice, in St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 731, 80 L.Ed. 1033: :

"The decisive point on this appeal is that, in seeking a separate allowance for going concern value, in addition to the value of the physical plant as found, and in maintaining that the property was being confiscated because of the absence of that allowance, it was incumbent upon appellant to furnish convincing proof."

In view of the fact that the Company has been allowed such large amounts for promotion and advertisement and has built up its going concern value entirely from the proceeds derived from its customers while conducting its business at a profit, and in view of the further fact that the going concern value is necessarily reflected to a large extent in the valuation of every part of its property, all of which is valued as a part of the system, it would seem that a relatively small additional amount should be allowed for going concern value.

As we hereinafter indicate, the unamortized portion of the cutover expense of $935,506.12 incurred in prior years may be included in the going concern value instead of in the operating expense.

We hold that it has not been convincingly shown that the Commission was in error as to going concern value except that we hold that $935,506.12, and no more, should be added to the fair value of physical properties for going concern value in lieu of the allowance by the Commission of this item as an operating expense.

### Obsolete Property.
### Gas Manufacturing Plant.

The next question to consider is the investment in retired gas plants. The basic question is whether or not these plants are usable. Los Angeles Gas & Elec. Corp. v. Railroad Commission of California, 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180. If the manufacturing plants are rendered useless by reason of the introduction of natural gas, these items should no longer be included in the capital structure of the Company.

The Commission held the value of gas manufacturing capital not used or usable to be $1,733,344. The evidence justifies the conclusion of the Commission that these stand-by plants, to the extent of the amount mentioned, are no longer

used or useful for public purposes. The fair value of the property of the Company used and usable for public purposes should be reduced by the amount of $1,733,344.

### Reproduction Cost New.

█ The cost to reproduce new, less depreciation, is not the equivalent of the value of the property. It is evidence of the value. The ascertainment of a reproduction cost new in rate making cases is not a matter of exact equivalent based upon the market value of supplies, and the cost of labor on the date the rates go into effect, or on any other particular day. The value to be assigned to the cost of reproduction new depends upon many variables. The selection of the particular cost to be used is a matter of judgment. The courts have indicated that in estimating the cost of reproduction new the data should not be confined to any particular day but should represent as near as may be averages maintaining through a period which represents a reasonable time for the actual reconstruction or duplication of the property. For the purpose of ascertaining the cost of reproduction new on the date the rates go into effect, the average construction and material cost for a substantial period must be considered. After obtaining a result based upon such calculations and predicated upon a certain period of years it is important also to note the price trends to determine the value of the property at the time of and immediately succeeding the date upon which the rates are fixed. If the prices have an upward tendency that fact should be reflected in the rate base. On the other hand, if the tendency is downward that fact should be considered. In the case at bar witness McNamara, who testified as to reproduction cost new, set forth his estimates of cost to reproduce new at the average prices for the years 1928 to 1932, for a four year average, July 1, 1929 to June 1933, and for a six months average, January to June, 1933.

The Master accepted McNamara's figures as uncontradicted and taking an average for the four years which would be required to reproduce the property found the present value as new for the period of the operation of the rates to be $117,014,158.

As the Company does not complain of the Special Master's average, and furnished the testimony upon which it is based, and does not object to the inclusion of 1933 in the average, we will not.

█ After stating the economic conditions in his report and after discussing $117,000,000 as an average reproduction cost, the Master says: "I would be inclined, nevertheless, despite the logical implication of the reproduction cost method in taking care of the time element to adopt a lower figure, say $115,000,000, or even the spot figure of July 31, 1933, $114,329,363." Nevertheless, the Master fixes the value of the Company's property as a going concern undepreciated at $128,426,286 for the year ending July 1934. He accepts the figure of $16,121,090, testified to by the Company's witness, as the depreciation, leaving as the rate base $112,305,196. This figure, as we have already indicated, includes an estimate for going concern value of $10,000,000. We have held that the only item of going concern value which has been satisfactorily proved over and above the allowance therefor already incorporated either in historical value or reproduction cost and not taken care of from time to time by allowance for operating expenses, is $935,506.12, the unamortized cut over expense up to the end of 1933. If we accept the Master's figures otherwise, his rate base is too great by $9,064,493.88. This would give a rate base of $103,240,703. Deducting therefrom $1,733,344, the value of gas manufacturing capital not used or usable which should not be included in the rate base, we have the balance of $101,507,359 as the rate base derived from the cost of reproduction new less depreciation.

In considering this matter two major controversies arise in the case; one concerning the value of the transmission system composed of cast iron pipes which have already exhausted a large part of the assigned useful life; the other concerning the stand-by manufacturing plants. Witness C. C. Brown contends that the cast iron pipe laid with bell and spigot joints would no longer be laid in reproducing the Company's property; that instead, welded steel pipe would be used. He concludes that the expenditure of $6,380,000 for repairs to prevent leaks of natural gas is an indication that the present system of cast iron pipes is worth $6,000,000 less than a corresponding system of new cast iron pipes (ignoring depreciation). The same witness also estimates that the plants of the Company used for the production of

manufactured gas for stand-by purposes could be replaced by plants to manufacture gas from butane, which could be built for $8,500,000 less than the cost to reproduce new the manufacturing plants included in the Company's property for stand-by purposes. This witness's estimate would be less by nearly $15,000,000 than the estimate of cost of reproduction new offered by the Company's witnesses.

The witness McNamara claims that the Commission's expert witness Brown is in error in estimating $2,500,000 for the construction of butane gas manufacturing plants for the replacement of the stand-by plants for which a value of $11,176,338 is claimed by the Company as the cost to reproduce new. In the Company's estimate, compressor and booster equipment having a value of $3,169,247 was included which would reduce the difference between the cost of new butane plants and the cost to reproduce new the present manufacturing plants to a little less than $5,500,000.

Willis S. Yard filed an affidavit on behalf of the Company claiming that butane gas generators would not be a practical replacement for the present manufacturing plants because the product so produced could not be burned in the customers' burners without adjustment, while the gas produced by the present plants as already altered for that purpose, could be burned without alteration of the customers' burners.

An examination of the evidence shows that the greater proportion of the difference of $11,800,000 between the historic cost of the Company's property and the estimate of cost to reproduce it new is in the production property constructed before 1919 and in the transmission lines laid by the Company before 1919. The difference in the former was $1,000,000 and the latter $10,000,000.[2]

If we assume that in re-laying these transmission lines new welded steel pipe would be or could be used in lieu of the more expensive cast iron pipe, with joints adapted to carry natural gas, it would not seem unreasonable for the Commission to allow the Company in its rate base the actual cost of the cast iron pipe system rather than the lesser cost of laying new steel pipe with welded joints, or the cost of reproducing the cast iron system new, particularly where allowance has been made in part for the cost of modification of the present system by the expenditure of several millions to equip the cast iron joints to carry natural gas. If we bear in mind that neither historic cost nor reproduction cost is conclusive evidence of value for a rate base and that both should be considered in arriving at the fair rate base, we cannot say that the Commission erred in its conclusion to accept historic cost as to the transmission system. The same proposition is involved in the manufacturing plants where there is a difference of $1,000,000 in the cost to reproduce new and in the historic cost. This is particularly true in view of the evidence that the plants could be replaced by a new plant equally effective with a saving of from $5,500,000 to $8,500,000. If the Commission had accepted the estimate of the witness Brown in its rate base we would be compelled to express an opinion on the conflicting claims as to the effectiveness of the butane gas production system proposed by the witness and opposed by the Company's witness McNamara, as above stated.

We hold that there is no clear showing of error in including in the rate base the historic cost of these two items, instead of the cost to reproduce new. This will reduce by $11,000,000 the estimate of the value of the Company's property and fix a rate base of $101,605,359 minus $11,000,000, that is, a rate base of $90,507,359.

The rate base fixed by the Commission ($105,000,000) depreciated by the amount of the depreciation reserve ($13,051,839) is

---

[2] The Company states in its brief:
"It appears from that table that of the total of $11,800,000 by which the reproduction estimate exceeds the original cost, $1,000,000 is found in the property under the head of Production Capital which was in existence in 1919, and some $10,000,000 in property under the head of distribution capital which likewise was in existence in 1919. This is in accord with Mr. McNamara's affidavit and with the conclusion which the Master drew.

"A large part of the production capital consists of plants for manufacturing gas, both those supplying communities not now served with natural gas and those now in use in the natural gas divisions as stand-by plants.

"The distribution capital consists of the distribution systems in the various communities served. Those systems consist largely of mains and service pipes. The distribution systems have for the most part been in existence for many years."

$91,948,161, which exceeds the value arrived at by the Special Master adjusted as above to $90,507,359. But the Commission held, in effect, that the Company was entitled to a reasonable net return on the depreciation reserve as compensation for its annually accruing depreciation.

### Gross Return.

The Commission estimated the return reasonably to be expected from the new rates to be $20,400,000; the Special Master estimated such return at $20,198,318.29, basing his conclusion upon the returns actually received during the period the rates had been in effect. In the year 1935 the actual return had increased to $22,051,590.95, making a total increase based upon the new rates of $2,135,150.60, allowance being made for the decrease of $281,978.95 of income taxes actually paid. In 1936 the gross income for gas sold, if paid for under the new rates fixed by the Commission, was $23,887,263.61, which, after making allowance for overestimated taxes of $257,940.70, was $3,946,886.02 over the Commission's estimate therefor.

It should be noted that the question as to the 1934 gross return is whether or not the estimate of the Commission was reasonable under all the circumstances. If so, it is not material that the return actually received was less than that reasonably anticipated. The view of the Special Master that the return actually received was decisive on the question of confiscation was erroneous. We accept the conclusion of the Commission that $20,400,000 gross return for 1934 was reasonably to be anticipated if adjustments are made for average temperatures.

The Special Master relied upon the decision of the Supreme Court, written by Justice Cardozo, in West Ohio Gas Co. v. Public Utilities Comm., 294 U.S. 79, 55 S.Ct. 324, 79 L.Ed. 773, wherein it is stated [page 325]: "A forecast gives us one rate. A survey gives another. To prefer the forecast to the survey is an arbitrary judgment." This statement, however, was addressed to the action of a public service commission which on March 10, 1933, fixed a rate to be retroactively applied from August 16, 1929, to February 16, 1933 and ignored the evidence that the actual net revenue for both 1930 and 1931 was inadequate, and based its rate upon the revenue and expense for the year 1929. Had the rate been established in 1929 instead of in 1933 the situation would have required prophecy on the part of the rate making body and its conclusion could not have been overborne by subsequent actual experience in determining whether the rates were reasonable when fixed.

The case of McCart v. Indianapolis Water Co., 302 U.S. 419, 58 S.Ct. 324, 82 L.Ed. 336, also is not inconsistent with our conclusion. In that case the public utility company brought an action to restrain the enforcement of an order fixing a temporary schedule of rates. Pending its further investigation, an interlocutory injunction was denied and the rates became effective. On December 30, 1932 the public service commission adopted different and permanent rates effective January 1, 1933. This order was attacked by an amended and supplemental complaint but no interlocutory injunction was sought and the rates became effective. The Special Master to whom the matter was submitted on April 18, 1934, offered to receive evidence of the actual return and expenses of the Company for the year 1933, but both parties declined to present such evidence. The decree of the District Court was not entered until November 29, 1935. The Supreme Court held that the District Court should have received evidence of the actual operation of the rate making ordinance in view of the fact that the ordinance had been in effect and the court was only concerned with the question of whether or not the rates were confiscatory at the time the decree was made or to be made. This case is not authority for the impossible proposition that a rate making body can only fix rates retrospectively. Its duty is to fix rates in advance and such rates are to be tested by the conditions known to it and ascertained as nearly as possible for the future. If the rates so ascertained are reasonable they are valid and cannot be enjoined unless and until it is shown that the rates, reasonable when ordered, have since become unreasonable and confiscatory; and by the same rule, if the rates, unreasonable when made, have become reasonable by reason of changed conditions the rates should for such period be enforced.

Hence we must determine whether the Commission's order was confiscatory for the year 1933, judging the order by the information then known to the Commission, and accepting its estimate of revenue, unless standing in its shoes we can say that the estimate of revenue and expense was clearly erroneous. If we hold this order

nonconfiscatory for 1933, it must be conceded to be valid for 1934, 1935 and 1936 when the returns were greater.

The City of Oakland, intervener, takes the position to the contrary and contends that if the rates for the period from July 1, 1933 to May 1936, based upon an average return for the whole period, give a fair return, the rates will not be held confiscatory for any part of the period. In pursuance of this theory it furnishes tables from which it deduces a return of 6.21 per cent for the first year (1933–34); a return of 7.23 per cent for the period (1934–35), and a return of 8.26 per cent for the nine months (July 1, 1935 to April 1936),—an average of 7.23 per cent for the entire period. These conclusions are based upon the Commission's estimates modified by actual results, and omitting amortization charges for the whole period aggregating $2,271,243.06. Similarly, using the Special Master's sinking fund method for estimating depreciation, and the ·Commission's rate base ($105,000,000) less accrued depreciation ($13,051,839), which equals $91,948,161, the City of Oakland claims an average return of 7.41 per cent as follows: 6.24 per cent, 7.41 per cent, 8.58 per cent, for the respective periods above mentioned. In support of its contention the City relies upon the decisions of the Supreme Court in United Gas Public Service Co. v. Texas, 303 U.S. 123, 625, 58 S.Ct. 483, 82 L.Ed. 702; St. Joseph Stock Yards Co. v. U. S., supra, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033; West Ohio Gas Co. v. Public Utilities Comm., 294 U.S. 79, 81, 55 S.Ct. 324, 325, 79 L.Ed. 773. These cases hold that it is proper and necessary in making estimates of returns under a proposed rate making order that a period of years be considered, rather than a single test year. In the main, these cases deal with the duty of the rate making body, which is prospective rather than retrospective, and, consequently, refer to past years of experience rather than to actual experience under the rate making order. The decision in United Gas Public Service Co. v. Texas, supra, was rendered on an appeal from the courts of Texas, where the rate making order was not effective until ordered enforced by the court which considered the whole matter de novo. It was held that the trial court could and should consider the period up to the time of trial (spring of 1934) as well as the four-year period prior to July 31, 1932, but the case on appeal " * * * must be judged as it stood before the trial court" in March 1934, and not as it stood on appeal in October 1935, nor, as we may add, not as it stood on appeal to the Supreme Court in February 1938. This decision must be read in the light of the power of the Texas court under the law of Texas to consider the question of whether the rates are reasonable and just. See statutes cited in the Supreme Court decision and quoted in the foot note thereto (Articles 6058, 6059, Rev.Civil Stats. of Texas (1925). We have already considered the case of West Ohio Gas Co. v. Public Utilities Comm., supra, and have shown that the rates there considered were fixed in March 1933, retroactively for the period from August 16, 1929 to February 16, 1933.

We hold, then, that the estimated income of $20,400,000 for the Company should be decreased by the estimated expenses, if reasonable, in determining the validity of the order.

If we take the amount of gas actually sold and increase it by the amount which would have been.sold in the year of average temperature and charge for the amount of gas thus determined at the new rates for the year 1933–34, we get an amount exceeding by $500,000 the actual receipts at the new rates.

### Net Income.

Using the deductions from the gross return, allowed by the Special Master for expenses, to find the net income, and using the actual gross income of the company ($19,794,572.81), adjusted at the rates fixed by the Commission for the gas sold and for temperature ($20,198,318.29), we find they would give a net income upon the rate base fixed by the Master ($112,305,196) of 3.89 per cent for 1934, and similarly upon the gas sold at the rates fixed by the Commission of 5.9 per cent for the year 1935, and of 6.8 per cent for the year 1936, the net returns used being $6,649,152.33 for the year 1934–1935 and $7,652,981.92 for the year 1935–1936, as hereinafter determined.

Upon his estimate of a return of 3.89 per cent the Special Master held the rate to be confiscatory and the rate making order consequently void. The larger return for subsequent years (1935, 1936) was not before him.

### Net Return on Historic Cost.

The Special Master found a going concern value of $10,000,000. Adding this to the historic cost as determined by him

($104,941,158) we get an undepreciated rate base of $114,941,158. Deducting depreciation (estimated by the Special Master on the historic cost basis as $13,051,839), the rate base would be $101,889,319. The net income ($4,791,897), allowing deductions as determined by the Special Master, would be 4.7 plus per cent thereon for the year 1934, and 6.5 per cent for 1935, and 7.5 per cent for 1936, using incomes of $6,649,152.23 and $7,652,981.92, respectively, for these last two years.[3]

## Deductions Allowable from Gross Income to Determine Return.

With reference to the proper allowances for operating expense and depreciation there are quite a number of differences between the parties herein, but, first we will consider some of the larger items in dispute.

### Cut-over and Repair.

One item is $982,165 for amortization of expenses incurred in previous years. One of the expenses, cut-over expense, was for adjusting appliances belonging to consumers to adopt such appliances to use natural gas when it was substituted for manufactured gas. The cost was incurred in the years 1929 to 1932, but by permission of the Commission was amortized over a number of years.

The other expense is for expenditures incurred in the years 1931 and 1932 for repairing or modifying the cast iron pipe system used in the Company's distributing system to reduce gas leakage by placing metal or cement clamps about the pipe joints. Beginning in the year 1931, for the purpose of spreading over future accounting periods the costs then being incurred, this expense, instead of being charged directly into maintenance expense accounts, was entered in a suspense account.

For the amortization of these expenses the Company claims a charge of $982,165 against revenue for the year ending July 1, 1934.

It is clear that these items of past expense have no place in an estimate of expenses to be deducted in 1934 and thereafter in determining whether the net revenue to be derived from the new gas rates in 1934 and succeeding years is so low as to be confiscatory. The cost of adjusting appliances owned by consumers was in the nature of an expense to get and to retain business. The Company elected to pay the expense necessary to change over their customers' appliances. Such expense may properly by reflected in the going concern value of the Company's business but not in its expenses for years subsequent to the year in which they were actually made. The expenditure made to repair the mains and pipes of the Company's distributing system was clearly a maintenance expense properly chargeable in the years in which the expense occurred and was deductible from the revenue of those years. If, on the other hand, it be treated as a betterment or addition to capital because such expense was made necessary by the change in the character of the gas transmitted it should be included in estimating the fair value of the Company's property.

The contention of the Company with relation to these expenditures is that it was expressly authorized by the Commission to place them in a suspense account and amortize them over the period of five years designated by the Commission in its orders, and that these orders were in effect orders permitting it an increased rate during the five year period designated in the orders for amortization; that in practical effect the Commission authorized the Company to receive an addition of $982,165 net revenue for the year 1934, and that the subsequent order fixing the rate under attack deprived them of that amount of income.

We have no occasion to inquire into the extent of the authority of the Commission with reference to the method of keeping the books of the public utilities controlled by it or the effect of its orders. The statute expressly authorizes the Commission to

---

[3] For convenience in the consideration of the various items entering into the rate base and into the appropriate deductions from the gross income, it should be noted that with a rate base of $100,000,000 a variation of $1,000,000 in return would make a difference of 1 per cent in the net rate of return and that if we accept the rate of return fixed by the Commission on the fair value of the Company's property as reasonable (6⅜%) on the rate base of $100,000,000, a variation of $15,000,000 in the rate base would vary the return by a like amount (1%). The difference ($7,305,196) between the rate base adopted by the Commission ($105,000,000) and that adopted by the Special Master ($112,305,196) accounts for about ½ of 1% in the rate of net return.

indicate and direct the method of bookkeeping it required of the Company. The Commission, during this period, also made a number of orders temporarily fixing the rates to be charged by the Company.

■ The total amount expended for cut over from 1929 to 1932 was $1,972,641.97. At the end of 1933 there remained of this amount $935,506.12 not yet amortized. This large balance resulted partly because no amortization for these items was charged in 1932. It follows that that portion of the allowance for amortization for cut over expense amounting to $657,350 should be rejected as an expense for 1933–34. As to the portion of this amount as has already been recovered by amortization as an expense of operation ($1,037,135.80 at the end of 1933) it would be manifestly unfair to add the amount to capital.

The expenditure for stoppage of leaks sought to be amortized occurred in the years 1931 and 1932. Whatever may be said of these charges and whatever arrangement may have been made or agreed to by the Commission, it is quite clear that they are not expenses incurred in the year 1933 and should not be deducted from the gross revenues of that year for the purpose of determining whether the rates fixed for that year are confiscatory. From the constitutional standpoint the expenditures for stopping leaks must be treated either as past expenses applicable to the years in which they occurred and therefore not to be recouped in subsequent years, or as betterments added to capital, or, preferably, as we will subsequently develop, as an allowance for past accrued depreciation to be considered in determining the sufficiency of the annual depreciation allowance made by the Commission for 1933–34.

### Amortization of Useless Gas Manufacturing Plants.

■ The Commission allowed $150,000 per annum for the amortization of the loss resulting from the manufacturing gas plants no longer used or useful for that purpose. The Company claims it should have been allowed $238,092 per annum for this purpose, which was allowed by the Special Master. Upon the question of confiscation we are concerned only with a reasonable return upon property used or useful. Consequently, no allowance should be incorporated in the fair value of the Company's property to cover these items nor should any amount for amortization be included in the deductions from gross revenue. The sum of $150,000 is not deductible as an operating expense.

### Accrued and Annual Depreciation.

■ One of the principal difficulties in fixing just compensation for the use of the property of a public utility arises from the fact that such property continuously depreciates. To make a proper annual allowance for such depreciation and to ascertain its present value by a deduction of the annual depreciation are the two phases of the problem. It is settled that in determining the fair value of the property for rate making purposes it is essential that accrued depreciation be deducted from the cost to reproduce new in using that evidence for the determination of the present value of the property. Similarly, in using the evidence of historic cost to determine present value there must be an appropriate deduction for accrued depreciation. The rate base should lie somewhere between the historic cost depreciated and the reproduction cost new depreciated.

■ The Supreme Court has held repeatedly that the question of confiscation is not a question of formulas, modes or methods used in arriving at the rate, but whether or not, under all the circumstances, just compensation for the use of the property of a public utility at its present value has been denied. Under the constitution the objective of the rate maker should be to ascertain the actual depreciation for the year or years in which the rates will be effective and to allow such depreciation as deduction from gross income; and, also, in measuring the return upon capital, to ascertain the value of the property as depreciated at the time of its use, as stated by Justice Butler speaking for the Supreme Court: "The just compensation safeguarded to the utility by the Fourteenth Amendment is a reasonable return on the value of the property used at the time that it is being used for the public service, and rates not sufficient to yield that return are confiscatory." Board of Public Utility Com'rs v. New York Telephone Co., 271 U.S. 23, 31, 46 S. Ct. 363, 366, 70 L.Ed. 808.

■ Notwithstanding the decision of the Supreme Court in that case that an excessive depreciation reserve belonged to the Company and could not be utilized by the Board of Public Utilities to eke out its estimate of income in later years, the Supreme Court has recently in a number of cases recognized the use of a sinking fund

to take care of the annual and accrued depreciation. Clark's Ferry Bridge Co. v. Public Service Commission, 291 U.S. 227, 54 S.Ct. 427, 81 L.Ed. 767; see also, Dayton Power and Light Co. v. Public Utilities Commission, 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267. By this method the Company may invest its depreciation reserve as it sees fit, thus having the use of it long before the property requires replacement, but is charged a reasonable rate of interest thereon so that the sum of the annuities plus the interest shall equal, as near as may be, the average value of the property during its life expectancy. The court held that there was no confiscation of property inherent in such a plan and that the question of whether or not the allowance of depreciation thus made was reasonable was one of fact to be determined, in the first instance, by the rate making body. The Commission, according to its opinion in this case, has "during its entire history" used the historical cost of property undepreciated with land at its present market value as the rate base, and to quote from its opinion, "consistent with this, it has used the sinking fund method to determine the allowance for depreciation to be included in operating expenses." That is, as appears by its opinion in this matter, it has determined the life expectancy of the various elements of depreciable property involved, and has assigned to each a depreciation annuity which at 6 per cent. compound interest from the date it accrues until the end of the life expectancy would equal the cost (not the average or present value) of the property. This method, it will be observed, takes no account of the fluctuating value or cost of the various elements entering into the property but assigns to each a value (its cost when acquired by the Utility Company, if prudently acquired) which remains constant during its entire life. There is no place in such a rate making plan for the use of the present value of the property, or average value, as determined from cost of reproduction new or otherwise. It follows that as the costs decrease, thus decreasing the present value of the property, the depreciation allowance fixed by the Commission would be too high, and as the reproduction costs increase the allowance would be too low. But the task of the court to determine whether or not a rate is confiscatory relates to the value of the property at the particular time when the rates under attack are to be effective. The question of confiscation is determined for this period by the return on the present value, notwithstanding the fact that a different method may have been used by the rate making body in arriving at its conclusion. The Commission fixed the depreciation annuity for the Company's property at $1,769,119. The depreciation reserve carried on the books of the Company at 6 per cent. compound interest amounted to $13,051,839. The Commission determined that 6 per cent. interest on this reserve ($783,110) plus the above annuity of $1,769,119 ($2,552,229 in all), was reasonable compensation to the Company for the depreciation which would accrue during that year (1933), based on historical cost of the depreciable property of the Company. It also allowed for income upon the accrued depreciation by using an undepreciated rate base. The net result of the Commission's plan is that the public utility obtains its return at the rate fixed by the Commission upon its entire capital investment including the portion which has been lost by reason of deterioration. The rate fixed by the Commission in this case is estimated by it at 6⅔ per cent. Thus, while the Company is charged with 6 per cent. interest on its accrued depreciation as an addition to its depreciation reserve, it is allowed 6⅔ per cent. interest thereon in the rate of return. The difficulty in passing upon the question of confiscation herein is enhanced by the necessity of translating this process of the Commission which, as it says, ignores present value, into one which must recognize and be based upon present value. This difficulty is further increased by the fact that capital expenditures of the Company have been scattered throughout the entire history of the utility and hence, some of its capital expenditures were made at the time of high prices, and others, at the time of low prices. The Commission's brief states that 80 per cent. of the Company's property has been constructed since 1919 during a period of relatively high prices.

The witnesses for the Company attempted to determine the accrued depreciation by taking the same proportion of their estimate of the cost to reproduce new that the depreciation reserve set up on the books of the Company bore to the historic cost, (13.6%). By this method, the figure of $16,121,000 is arrived at as an estimate of the depreciation which had accrued prior to June 15, 1933. This method of translating the depreciation reserve based upon historic cost to one based upon reproduction cost ignores the fact that the deprecia-

tion reserve upon the sinking fund basis does not at any time represent the actual accrued depreciation. This difficulty is met in part by the expert testimony of James T. Ryan, the Company's valuation engineer, based upon his intimate knowledge of the property and of its physical condition and of the reasonable life expectancy of such property. He fixed the amount of the depreciation of the gas properties as a whole at not less than 12 nor more than 16%, "having a present condition of not less than 84 nor more than 88%".

The Special Master, in analyzing the testimony of this witness, concluded that the amount stated by the witness for accrued depreciation really represented a depreciation reserve on the sinking fund basis. The Special Master fixed the annual allowance for depreciation at $3,099,581. He arrived at this figure by what he characterized as a modified sinking fund basis upon life expectancies of the various elements of the property determined by him differently from the determination of the Commission. To reach this conclusion he deducts from depreciable capital ($113,097,-966) valued at reproduction cost (see Table VI, Note 4), the accrued depreciation claimed by the Company of $16,121,090, leaving a depleted value of $96,976,876, for the depreciable capital. He finds the sinking fund annuity applicable to such base to be $2,132,326. To this annuity he adds 6 per cent interest on $16,121,090, or $967,-265, giving $3,099,591. By this method the $16,121,090 estimated depreciation reserve is deducted from the rate base and at the same time taken as the fund in the theoretical reserve to which is added each year 6 per cent interest thereon for the reserve, plus the annuity of $2,132,326. That the difference between the result arrived at by the Commission and by the Special Master is due in part to the acceptance by the latter of different life expectancies for different elements of property, and in part to the use of higher values as reproduction cost new is shown by his estimate that the depreciation annuity on the historic cost basis should be $1,901,390, to which should be added 6 per cent on the depreciation reserve, giving a total of $2,684,500, as an estimate of the annual amount to be accumulated in the depreciation reserve.

Gilbert M. Thomas, an expert witness for the Company, made an affidavit to the effect that he had computed the straight line depreciation expense using the lives recommended and used by the witness Travis in his affidavit, offered in evidence by the Commission, and the estimated reproduction cost new stated by J. T. Ryan in his affidavit, and found that the depreciation expense so developed was not less than $4,046,771, but that by using the cost of reproduction new and the lives which the witness assigned to the various elements of the Company's property, the depreciation allowance should be not less than $4,-865,698. These estimates are based upon the straight line method and ignore the sinking fund theory.

The question for our determination is whether the allowance for annual depreciation fixed by the Commission for the years 1934, 1935 and 1936 is clearly shown to be unreasonable.

We have already indicated that the Commission is justified in accepting the historic cost for transmission lines and production plant in lieu of the reproduction cost thereof. This would reduce the depreciable property by about $11,000,000 in value and would have a corresponding effect upon depreciation allowance. The amount allowed for amortization for repair of cast iron pipe lines was in effect an allowance for depreciation or obsolescence. At any rate, it could be only justified upon that theory, it apparently being the practice of the Commission to take care of obsolescence due to unexpected changes in the utility business by making special allowances for amortization of the loss as an operating expense, which is consistent with its plan for a full return of capital. While we have held that these items are not proper charges against the gross income for the current years in which they were amortized, if these sums are regarded as an allowance for obsolescence, they should be added to the amounts for depreciation and thus to the depreciation reserve. The effect would be the same upon the net income whether they are deducted in one form or the other.

With reference to lives assigned to the property by the Commission we see no clear and unequivocal reason for departing from their estimate, notwithstanding the conclusion of the Special Master.

It should be noted also that abandoned and obsolete property has been written off against the depreciation reserve when it ceased to serve a useful function and that the physical properties of the Company are well maintained.

We conclude that the sinking fund annuity of $1,769,119 allowed by the Commission, plus 6 per cent interest on the depreciation reserve, $783,110.34, plus the net return on the same amount included in the rate base (estimated at 6⅔ per cent by the Commission $870,123.50, plus the amount allowed by way of amortization of the pipe repair suspense account $324,815, making a total of $3,747,167.84 cannot be said to be so clearly erroneous as to require us to reject it.

It follows that for the purpose of ascertaining the net returns on the depreciated base—the value of the Company's property—the amount chargeable against the gross income for the year 1933-34 as a depreciation annuity and allowance should be $1,769,119, plus $870,123.50, plus $324,-815, which equals $2,964,057.50. We will consider the proper allowance for the years 1934–35 and 1935–36 later when dealing with that subject.

### Other Controverted Deductions.

In the first brief of the Commission on this hearing tables are presented which indicate the actual results stipulated (Table I) and other tables showing the points of difference between the claims of the Commission and the findings of the Special Master. (Tables entitled "Comparison of Results" and "Acceptable Results", which the Commission says it "may concede for the purposes of this case".) These tables are shown in the footnote [4] and will be

[4] TABLE I
Results as Reported by Company 12 Month
Periods ending May 31,

| | 1931 Exhibit 66 | 1932 Exhibit 66 | 1933 Exhibit 66 | 1934 Exhibit "C" |
|---|---|---|---|---|
| Gross Revenue at Rates Collected | $18,395,280.82 | $22,318,161.71 | $21,895,588.84 | $21,661,677.29 |
| Expenses of Operation: | | | | |
| Production | 3,024,370.34 | 3,741,746.54 | 3,628,138.12 | 3,776,965.20 |
| Transmission | 280,436.27 | 453,356.10 | 356,947.71 | 287,847.23 |
| Distribution (Ex. Amortization) | 1,985,014.27 | 2,060,824.89 | 1,838,983.16 | 2,267,261.17 |
| Amortization of Cut-over Exp. | 42,000.13 | 122,913.37 | 273,895.90 | 657,350.17 |
| Amortization of Extra Maintenance | — | 106,248.23 | 365,409.09 | 344,078.60 |
| Commercial | 1,010,478.30 | 1,040,709.91 | 982,647.20 | 1,001,745.85 |
| New Business | 712,634.63 | 811,155.36 | 821,344.11 | 770,544.40 |
| General & Administrative | 556,588.86 | 644,513.82 | 631,883.28 | 672,472.09 |
| Injuries & Damages | 87,989.48 | 48,562.06 | 41,317.94 | 77,520.55 |
| Insurance | 123,437.61 | 134,648.50 | 139,849.50 | 26,862.24 |
| Uncollectible Accounts | 73,772.63 | 75,890.40 | 137,885.95 | 252,279.62 |
| Taxes | 2,099,176.86 | 2,159,663.60 | 2,187,555.32 | 2,640,872.90 |
| Subtotal | 9,995,899.38 | 11,400,232.78 | 11,405,857.28 | 12,775,800.02 |
| Depreciation Expense | 2,077,713.15 | 2,064,923.91 | 2,181,768.31 | not shown |
| Amortization Gas Plants | — | — | — | |
| Total Expense | 12,073,612.53 | 13,465,156.69 | 13,587,625.62 | |
| Net Revenue at Rates Collected | 6,321,668.29 | 8,853,005.02 | 8,307,963.22 | |
| Reduction in Gross Revenue Resulting from Commission Order 11/13/33 | | | | |
| Gross Revenue at Rates Ordered | | | | |
| Tax Reduction at Rates Ordered | | | | |
| Total Expenses at Rates Ordered | | | | |
| Net Revenue at Rates Ordered | | | | |

| Findings In Commission's Decision of Nov. 13, 1933 | Findings of Special Master May 7, 1935 | Results as Reported by Company 12 month periods ending July 15, | | |
|---|---|---|---|---|
| | | 1934 Exhibit X | 1935 Exhibit X | 1936 Exhibit X |
| $22,500,000. | $22,217,260.29 | $21,715,072.81 | $24,102,346.95 | $25,680,465.61 |
| 3,780,000. | 3,859,323.49 | 3,874,445.34 | 4,602,353.30 | 5,072,807.75 |
| 293,000. | 268,847.23 | 289,012.44 | 353,582.27 | 294,796.33 |
| 2,360,000. | 2,267,261.17 | 2,296,861.24 | 2,346,333.15 | 2,294,533.14 |
| — | 657,350.17 ⎫ | 967,516.72 | 557,202.03 | 32,248.31 |
| — | 324,814.51 ⎭ | | | |
| 1,010,000. | 1,001,745.85 | 1,006,974.47 | 1,049,671.79 | 1,083,108.12 |
| 812,000. | 770,544.40 | 769,843.07 | 749,792.12 | 743,310.59 |
| | 638,905.77 | 707,023.84 | 744,154.19 | 741,320.12 |
| 702,000. | 77,520.55 | 77,163.94 | 85,290.53 | 179,400.13 |
| | 26,862.24 | 26,872.75 | 28,449.74 | 30,777.35 |
| 138,000. | 162,279.62 | 253,046.25 | 116,062.93 | 121,206.45 |
| 2,741,000. | 2,705,978.42 | 2,626,098.63 | 2,926,648.97 | 3,180,009.61 |
| 11,836,000. | 12,761,433.42 | 12,894,858.69 | 13,559,541.02 | 13,773,517.90 |
| 1,769,119. | 2,132,326.00 | not shown | not shown | not shown |
| 150,000. | 238,092.00 | 238,092.00 | 238,092.00 | 238,092.00 |
| 13,755,119. | 15,131,851.42 | 13,132,950.69 | 13,797,633.02 | 14,011,609.90 |
| 8,744,881. | 7,085,408.87 | 8,582,122.12 | 10,304,713.93 | 11,668,855.71 |
| 2,100,000. | 2,018,942.00 | 1,920,500.00 | 2,050,756.00 | 1,838,038.00 |
| 20,400,000. | 20,198,318.29 | 19,794,572.81 | 22,051,590.95 | 23,842,427.61 |
| 451,762. | 277,604.52 | 264,068.75 | 281,978.95 | 257,940.70 |
| 13,303,357. | 14,854,246.90 | 12,868,881.94 | 13,515,654.07 | 13,753,669.20 |
| 7,096,643. | 5,344,071.39 | 6,925,690.87 | 8,535,936.88 | 10,088,758.41 |

## TABLE II
### Acceptable Results

| | Twelve Months Ending July 15, | | |
|---|---|---|---|
| | 1934 | 1935 | 1936 |
| Gross Revenue at Rates Collected, | $ 21,715,072.81 | $ 24,102,346.95 | $ 25,680,465.61 |
| Rate Reduction | 1,920,500.00 | 2,050,756.00 | 1,838,038.00 |
| Gross Revenue at Rates Ordered, | $ 19,794,572.81 | $ 22,051,590.95 | $ 23,842,427.61 |
| Expenses of Operation: | | | |
| Production | 3,874,445.34 | 4,602,253.30 | 5,072,807.75 |
| Transmission | 270,812.44 | 353,582.27 | 294,796.33 |
| Distribution | 2,296,861.34 | 2,346,333.15 | 2,294,533.14 |
| Commercial | 1,006,974.47 | 1,049,671.79 | 1,083,108.12 |
| New Business | 769,843.07 | 749,792.12 | 743,310.59 |
| General & Administrative ⎫ Injuries & Damages ⎬ Insurance ⎭ | 702,000.00 | 702,000.00 | 702,000.00 |
| Uncollectible Accounts | 162,279.62 | 116,062.93 | 121,206.45 |
| Taxes | 2,362,029.88 | 2,644,670.00 | 2,915,343.51 |
| Subtotal | $ 11,444,446.16 | $ 12,564,465.56 | $ 13,227,105.89 |
| Depreciation | 1,769,119.00 | 1,769,119.00 | 1,769,119.00 |
| Extra Depreciation on Retired Gas Plants | 150,000.00 | 150,000.00 | 150,000.00 |
| Total Expenses | $ 13,363,565.16 | $ 14,483,584.56 | $ 15,146,224.89 |
| Net Revenue | 6,431,007.65 | 7,568,006.39 | 8,696,202.72 |
| Three year Average | | $ 7,565,072.00 | |
| Net Return Equivalent to 6% on base of | $107,183,460.00 | $126,133,440.00 | $144,936,712.00 |
| Three year Average | | $126,084,537.00 | |
| Return in Per Cent on Rate Base of $105,000,000.00 | 6.12% | 7.20% | 8.28% |
| Three year Average | | 7.20% | |

utilized as a basis for our discussion of the points in dispute and for our decision thereon.

The final reply brief of the Company, filed July 15, 1938, points out the particulars in which the "acceptable results" shown in the footnote are not acceptable to it, as follows: (1) Gross revenue; (2) amortization of cut over and extraordinary leakage expense; (3) allowance for general and administrative expense, fire and casualty insurance; (4) allowance for uncollectible accounts; (5) taxes; (6) amortization of retired gas plants. We have already considered all items thus mentioned except items (3), (4), and (5). We will now consider these three points of difference.

General and Administrative Expense; Fire and Casualty Insurance.[5]

Item (3) is stated by the Commission as $702,000. The amounts expended by the Company, and the amount allowed therefor by the Special Master is shown in Table I of the footnote. The amount shown as expended for these items for the year ending July 15, 1934 is the sum of $707,023.84 for general and administrative expense; $77,163.94 for injuries and damages; $26,872.75 for insurance, making a total of $811,060.53. The allowance of the Special Master for these respective items was $638,905.77; $77,520.55; and $26,862.24, a total of $743,288.56. The amount claimed by the Company before the Special Master for these

Comparison of Results.

| | Findings of Commission | Findings of Master | | Difference Master over Commission |
|---|---|---|---|---|
| Revenues—at new rates | $ 20,400,000 | $ 20,198,318 | mi. $ | 301,682 |
| Expenses: | | | | |
| Production | 3,780,000 | 3,859,323 | pl. | 79,323 |
| Transmission | 293,000 | 268,847 | mi. | 24,153 |
| Distribution (Ex. Amortization) | 2,360,000 | 2,267,261 | mi. | 92,739 |
| Amortization cut-over expense | — | 657,350 | pl. | 657,350 |
| Amortization Extra Maintenance | — | 324,815 | pl. | 324,815 |
| Commercial | 1,010,000 | 1,001,746 | mi. | 8,254 |
| New Business | 812,000 | 770,544 | mi. | 41,456 |
| General & Administrative | | 638,906 | | |
| Injuries & Damages | 702,000 | 77,521 | pl. | 41,289 |
| Insurance | | 26,862 | | |
| Uncollectibles | 138,000 | 162,280 | pl. | 24,280 |
| Taxes | 2,289,238 | 2,428,374 | pl. | 139,136 |
| Total Above Expenses | $ 11,384,238 | $ 12,483,829 | pl. | 1,099,591 |
| Depreciation Annuity | 1,769,119 | 2,132,326 | pl. | 363,207 |
| Amortization of Gas Plants | 150,000 | 238,092 | pl. | 88,092 |
| Total all Expenses | $ 13,303,357 | $ 14,854,247 | pl. | 1,550,890 |
| Net Revenue | $ 7,096,643 | $ 5,344,071 | mi. | 1,752,572 |
| Undepreciated Rate Base | $105,000,000 | $128,426,286 | pl. | 23,426,286 |
| Rate of Return | 6.76% | 4.16% | | |

Findings of Master with use of Depreciated Rate Base:

| | |
|---|---|
| Depreciation Expense | $ 3,099,591 |
| Other Expenses (listed above) | 12,721,921 |
| Total Expense | $ 15,821,512 |
| Net Revenue | 4,376,806 |
| Depreciated Rate Base | 112,305,196 |
| Rate of Return | 3.89% |

[5] It should be stated that the items of "General and Administrative Expense", "Insurance" and estimates for "injuries and damages" are a pro rate to the Gas Department of the total expenditures of the Company for these items, such expenditures being prorated in proportion to the gross revenue received by each department and, therefore, fluctuates with the relative fluctuation of such gross revenues. It is quite clear that in separating the business of the Company into two departments—gas and electric—for rate making purposes, thus requiring each department to furnish a nonconfiscatory net return on the capital devoted to that business, that the damages and injuries of each department should be separately ascertained, and that injuries received in one department should not be paid for in whole or in part from the income of another. This question is discussed in the earlier briefs filed herein but on final hearing no serious point is made of it as the Commission's "acceptable results" clearly recognize such division.

respective items was $672,472.09; $77,520.-55 and $26,862.44, a total of $776,854.88. The Special Master disallowed $12,840.27, donations to charities; $2,147.78, legal fees, in connection with the income tax returns for 1924–30 as not likely to be again required in 1933; $420.80 legal fee for water and power legislation as not properly chargeable to the gas department, and $1,-524.91 for the expense of publishing a company magazine which had been discontinued; and $16,632.56 fees and expenses in this case; making a total disallowance of $33,566.32 from the item of $672,472.09 claimed by the Company. The other two items ($77,520.55 and $26,862.44) were allowed by the Special Master for the full amount claimed by the Company.

The items of general and administrative expense, injuries and damages, and insurance, going to make up the total of $702,000 fixed by the Commission, is based upon the testimony of E. F. McNaughton, and is itemized in Exhibit 4, shown below.[6]

The item for fire insurance reserve of $78,000 is conceded to be excessive for the reason that fire insurance could be procured from insurance companies, and the premium therefor would be only $50,000, of which the gas department's pro rata would be $26,862.44, the amount allowed by the Special Master. For injuries and damages the Commission allowed $80,000, which was accepted by the Special Master. The witness Thomas, for the Company, fixed the amount at $115,000, and the witness Hodges fixed it at $122,908, as a proper accrual to the reserve. Both used as the basis .55 of one per cent of gross revenue as an estimate of the reserve for injuries and damages, but used different estimates of gross income, hence the difference in estimates. It was claimed that thirteen years experience had shown that this was a proper allowance and that only $70,000 remained in the reserve applicable to the gas department. The actual charges to this reserve for the 13 years ending December 31, 1932 was $3,357,035.70, which was .51 of one per cent of the gross operating revenue $663,-081,289.46 for the same years. This relationship between gross revenue and the amount required to pay claims for injuries and damages may give a convenient method of computing the required allowance, but there is no such actual relation of cause and effect as would justify or require the acceptance of a ratio of .55 of one per cent of the gross income as a proper or necessary allowance therefor. On the other hand, the actual losses of the Company because of injuries and damages for the years ending May 31, 1931, 1932 and 1933, were respectively $87,979.48; $48,562.06; and $41,317.94, an average of $59,286.49. The item for the year ending May 31, 1934 was $77,520.55. There is no adequate reason for increasing the allowance by the Commission of $80,000.

We do not find it necessary to go into the question of contributions to charity, as the Supreme Court has held in West Ohio Gas Co. v. Public Utilities Comm., supra, that allowance of such amounts depends upon the question of whether or not the Company was substantially benefited thereby, and the Commission has made the allowance, evidently upon the theory that the Company was so benefited. Some of the other items disallowed by the Special Master were not included in the amount allowed by the Commission. The item of $702,000 allowed by the Commission should be reduced by the sum of $51,137.66 (the overestimate for fire insurance), and so reduced is fixed at $650,862.34.

### Bad Debts.

Item (4) is an estimate of the losses which will occur in 1933–34 by reason of

[6] Exhibit 4.

| Account No. | | |
|---|---|---|
| 841 | General Office salaries and expenses | $115,000. |
| 842 | Other  "        "        "        "        " | 345,000. |
| 844 | "        " supplies "        " | 50,000. |
| 845 | Other  "        " expenses | 40,000. |
| 846 | Law expense, general | 20,000. |
| 847 | Operation of communication system | 6,300. |
| 851 | Donations | 39,000. |
| 852 | Regulatory Commission expense | 500. |
| 854 | Other miscellaneous expense | 15,000. |
| 856 | Maintenance communication system | 7,600. |
| 848 | Insurance reserve | 78,000. |
| 849 | Casualty reserve | 80,000. |
| | | $796,400. |
| 863 | Deduct credit for pro rata of operating expenses chargeable to affiliated companies, | 94,000. |
| | Balance | $702,400. |

uncollectible debts. The Commission allowed $138,000, which was more than the average for the preceding four years ($124,563.75) and, as it turned out, more than 1935 ($116,062.93) or 1936 ($121,206.45), but less than 1934 ($253,046.25), and less than the average for 1934 to 1936, inclusive. The witnesses before the Commission based their judgment of $138,000 upon a study of the books of the Company from which they estimated a loss of .59 of one per cent. We cannot say that the conclusion of the Commission was unreasonable.

### Taxes.

The corrections made in Exhibit 4 referred to in the stipulation have taken care of the deductions in federal income tax and state taxes for which the Commission contends.

### Summary.

To summarize our conclusions on these differences, we find, (1) gross revenue for 1934 to be reasonably estimated at $20,400,000; (2) the amortization for pipe repair expense of $324,815 should be disallowed as an expense but allowed as a recognition of depreciation to be included in the depreciation annuity. The item of $657,815 for cut over expense should be disallowed excepting as reflected in going concern value, as heretofore discussed and allowed; (3) the allowance for general and administrative expense, fire and casualty insurance, injuries and damages, at $702,000, less $51,137.66 for fire insurance being the difference between the amount allowed of $78,000 and the amount conceded to be reasonable, $26,862.44, an aggregate of $650,862.44 ($702,000 less $51,137.66) is the amount found by the Commission for this item less the correction. No point is made on review of the Special Master's findings concerning other items he disallowed aggregating $33,568.32, supra.

Amendments to Table of Acceptable Results Shown in Note 4, see p. 525.

To apply this summary we turn to the table of "Acceptable results" and add to gross income the difference between the Commission's estimate of $20,400,000, and the actual gross revenue (adjusted) of $19,794,572.81, amounting to $605,427.19. We accept the Commission's estimate of $3,780,000 for "production expense" as reasonable as against actual of $3,874,445.34, (a difference of $94,445.34, reducing expense by that amount). We also accept the Commission's estimate of $293,000 for "transmission expense", an increase over the actual ($270,012.44) of $22,987.56; for distribution expense $2,360,000 allowed by the Commission against $2,296,861.34 actual (an increase of $63,138.66); commercial $1,010,000, being more than actually expended ($1,006,974.47) by $3,025.53; new business allowance by the Commission $812,000, actually expended $769,843.07 (a difference of $42,156.93 in amount allowed). Uncollectible accounts as allowed by the Commission $138,000, being less than the acceptable results ($162,279.62) by $24,279.62. The net result of these changes is an increase of only $12,583.72 in the expenses above mentioned over the table of "Acceptable Results".

Taxes re-estimated we take at amount adjusted to reduced rates shown in Table II, Note 4, at $2,362,029.88. Amortization of gas plants of $150,000 is disallowed. Depreciation is fixed as above. Thus modified we have the table of "Acceptable Results" for 1933–34, as follows:

|  | 1934 Acceptable results as claimed by Commission in brief | 1934 As modified by Court |
| --- | --- | --- |
| Gross revenue $19,794,572.81 | | 20,400,000. |
| Production expense | $ 3,874,445.34 | $ 3,780,000 |
| Transmission expense | 270,012.44 | 293,000 |
| Distribution          " | 2,296,861.34 | 2,360,000 |
| Commercial | 1,006,974.47 | 1,010,000 |
| New Business | 769,843.07 | 812,000 |
| General and Administrative, Injuries and Damages | 702,000.00 | 650,862.34 |
| Uncollectible Accounts | 162,279.62 | 138,000 |
| Taxes | 2,362,029.88 | 2,362,029.88 |
| Depreciation | 1,769,110.00 | 2,964,057.50 |
| Extra Depreciation on retired gas plants | 150,000.00 | —— |
| Total | $13,363,565.16 | $14,369,949.72 |

Net revenue, $6,030,050.28

Taking the fair value of the property at $90,507,359 fixed as above the rate of return for the year 1933–34 is 6.6625 per cent.

26 F.Supp.—34

For 1934–35 the gross return is increased to $22,051,590.95, and for 1936 to $23,842,427.61; the expenses actual for 1934–35 (see Table I, Note 4) reported as $13,515,654.07, plus depreciation $2,964,057.-50, gives a total of $16,479,711.57; deduct from this estimate of expense $238,092, for amortization of gas plants; $557,202, for amortization of cut over and repairs, and $281,978.95, for taxes not required at reduced rates; a total of $1,077,272.95, leaves expenses at $15,402,438.62, and net return at $6,649,152.33, a return at the rate of 7.-3465 per cent on the fair value at $90,507,-359.

For the year 1935–36, gross return $23,-842,427.61, operating expense (Table I) $13,753,669.20, plus $2,964,057.50, depreciation, gives a total $16,717,726.70; deduct from expenses for reduced taxes $257,940.-70, for amortization of gas plant $238,092, for amortization of cut over and repairs $32,248.31, a total reduction of $528,281.01 gives an expense of $16,189,445.69 which, deducted from revenue, gives $7,652,981.92, which gives a net return on capital of $90,-507,359, of 8.4556 per cent.*

█ A good deal of attention is properly given in the briefs to the question of the rate of return which measures the limit of the rate making power under the Constitution. The Commission found that a rate of 6⅔ per cent was nonconfiscatory. The estimated net return for the year 1933–34 is almost exactly that amount. The Special Master found the fair rate of return to be 7 per cent. The Commission found the rea-

sonable cost of money to the Company throughout its recent history to be 6.10 per cent, the maximum to be 6.19 per cent. We will not extend this opinion by an elaborate presentation of the Company's financial dealings over a period of twenty years. It is sufficient to say that in view of the lowered rates of interest and the difficulties of securing safe investments recent decisions have shown a tendency to approve rates of return as low as 6 per cent. Arkansas Louisiana Gas Co. v. City of Texarkana, 8 Cir., 96 F.2d 179, 188.

The expense for new business allowed by the Commission was $812,000. There seems no reason why the Company could not economize in this item if its income had threatened to go below the point of confiscation. The Company did in fact reduce the new business expense about $42,000. Certainly the Company cannot claim to have the sole power over such expenditures and complain of confiscation because the revenues do not sustain such expenditure, and the allowance by the Commission of this item must be considered in the light of its other findings as to the net revenue.

We conclude that the charge of confiscation is not clearly shown by this record.

### Findings of Fact.

Our findings of fact are that the fair value of the Company's property is $90,-507,359; that its depreciation reserve in 1933–34 was $13,051,839, should be $15,-604,068 for 1934–35 and $18,309,431.08 for the year 1935–36; that the gross revenue

---

* In these calculations we have ignored the changes in the depreciation reserve due to the annual addition of the depreciation annuity ($1,769,119) and to the interest at six per cent on the whole reserve. These additions for 1933–34 amounted to $2,552,229 ($1,769,119 plus 6% on $13,051,839 [$783,110.34]), making the reserve at the beginning of 1934–35 $15,604,068, to which must be added the depreciation annuity $1,769,119 plus 6% on the depreciation reserve of $15,-604,068, amounting to $936,244.08, a total of $2,705,363.08 giving a depreciation reserve of $18,309,431.08 for the year 1935–36. The interest on this amount at 6% is $1,098,565.86 which exceeds the amount we have used in our calculations for 1935–36 by the difference between $1,098,565.86 and $783,110.34, supra, which is $315,455.52 (which represents .34853 of one per cent on the fair value of the company's property).

Assuming a straight line depreciation which is the same from year to year as to the various items of depreciable capital, and fixing the annual depreciation for 1935–36 for the same amount as above stated for the year 1933–34 at $3,-747,167.34 the $315,455.52 additional interest on the depreciation reserve would decrease by that amount the necessary allowance from the gross returns for annual depreciation for 1935–36. Consequently, the net revenue should be increased by that amount which would increase the rate of return from 8.4556% by the addition of .34853% making a return of 8.804% for the year 1935–36.

Similarly, for the year 1934–35 the difference in interest on the reserve would be .$153,133.74 (that is 6% on the increase of $2,552,229). This amount would increase the net return by that amount or by .16919 of one per cent, making the net return for 1934–35 7.-5156%.

for 1933–34 was properly estimated at $20,-400,000, and the expenses plus depreciation for 1933–34 amounted to $14,369,949.72, leaving an estimated net revenue of $6,030,-050.28, which is 6.6625% of the fair value; that this return is reasonable and not confiscatory; that the actual gross income for 1934–35 at the new rates was $22,051,590.-95; that the expenses plus depreciation as found above ($2,964,057.50) are $15,402,-438.62, giving a net return of $6,649,152.33, or 7.3465% on the fair value of $90,507,-359. To this amount should be added $153,-133.74 interest on the amount of the increase in the depreciation reserve, giving a net return of 7.5156% for the year 1934–35.

The actual gross income for 1935–36, estimated for the full year, at the new rates was $23,842,427.61; that the expenses plus depreciation amount to $16,189,445.69, giving a net return of $7,652,981.92 or 8.4556% on the fair value which is stipulated to be the same as in 1933–34. To this return should be added $315,455.52, being 6% interest on the amount of the increase in the depreciation reserve over that reserve in 1933–34, making the net return for the year 8.804%; that a rate of return of over 6.5% is not confiscatory; consequently, that the order of the Commission has not resulted in confiscation of the Company's property.

The foregoing summary of facts constitutes our findings of facts. Arrangements will be made for a refund under the supervision of the court.

The decree will be that the plaintiff take nothing by this action and pay its own costs, the Commission also to pay its own costs, except as otherwise agreed. The final decree will be entered at once, the court retaining jurisdiction to supervise the repayment of overcharges which have been empounded by the Company in pursuance of a stipulation herein. The parties at once will submit a plan for the repayment of such amounts, unless an appeal or rehearing is sought.

On Petition for Rehearing or New Trial.

■ The first question urged upon us is that the finding of the Commission of a rate base of $105,000,000 should be taken as the fair value of the property and that we should assume that proper allowance had been made already for depreciation notwithstanding the fact that the Commission referred to the $105,000,000 finding of value as the undepreciated value. The point is of critical importance only as it bears upon the question of due process of law. The Supreme Court in this case has disposed of that question, holding that there was no denial of due process of law by the Commission because of the way it considered or refused to consider the evidence of reproduction cost new.

The plaintiff does not contend that it is entitled to a fair return upon a rate base of $105,000,000 solely because that was the fair value of the plaintiff's property fixed by the Commission; but it claims that by ignoring this finding of the Commission, as construed by the Supreme Court, this court has not given to the findings of the Commission the weight to which they were entitled in reaching its own finding of the fair value. In this connection plaintiff argues: "But if the Supreme Court's construction is to be followed, there is no escape from the fact that the Commission found the historic cost is the present fair value and a present fair value rate base is always, in the very nature of things, a depreciated rate base. * * * We submit that if the finding of the Commission is to be accepted, it must stand unless it is overcome by convincing evidence."

■ Assuming that the rates fixed by the Commission were arrived at by due process of law, the question remaining for the consideration of this court is whether or not the rates fixed were confiscatory. That question depends upon its judgment and finding as to the fair value of the property and its judgment and finding as to what amount of income would be a fair return upon the fair value so found, having due regard to the decision of the Commission on these questions. As shown in the court's opinion and findings, the court arrived at its finding of fair value by considering the findings of the Special Master on that subject item by item, each finding of the court being reached with due regard to the corresponding finding of the Railroad Commission.

The plaintiff claims that by this process of reaching an independent result as to the fair value of the property the court failed to give to the ultimate finding of value by the Railroad Commission, $105,000,000, the weight which the court properly held was to be attached to the findings of the Commission. The findings of the Commission, treated as an entirety, show that the question of accrued and annual depreciation was taken care of in such fashion (upon the prudent investment and sinking fund the-

ory) as to clearly indicate that the $105,-000,000 value was in fact the finding by the Commission of the undepreciated cost of the property and, consequently, that the depreciated rate base derived from the findings of the Commission should be $91,948,-161. Our finding of fair value, adjusted as hereinafter indicated, exceeds that amount.

██ Plaintiff also contends that if the court finds upon a consideration of the evidence in the case that the finding of the Railroad Commission of what purports to be the fair value of the property ($105,000,-000) was in fact a mere finding of the historic cost of the property, it should then hold that there was no finding by the Railroad Commission of the fair value of the property and, consequently, that there has been a denial of due process by the Commission. The court cannot agree to this proposition. The question of denial of due process by the Railroad Commission in reaching its conclusion is no longer a debatable one before the court in this case.

### Cost of Retired Plants.

It is contended by the plaintiff, and conceded by defendants, that in the figures presented to and found by the Special Master for reproduction cost new the item $1,733,-344 for retired manufacturing plants had already been deducted. It follows from this that the rate base fixed by the court is too low by that amount.

### Cutover Expense.

██ The unamortized part of the cutover expense at the time the rates went into effect July 16, 1933, is admitted to be $1,-236,791.61. The plaintiff states that if the amount of this expenditure is to be included in the going concern value as found by the court the amount should be $1,236,791.61 instead of $935,506.17, a difference of $301,-285.44. The court therefore finds that the amount paid for cutover expenses should be considered as expense incurred in order to increase the going concern value of the property and that the rate base should be increased by the amount of $301,285.44. Subject to this change we adhere to the court's finding of going concern value.

### Deduction of $11,000,000 from Reproduction Cost New.

██ The finding of the court that the historic cost of the production and distribution capital should be taken as a basis of valuation was not based upon a theoretical substitution of a new type of equipment for an old type of equipment as the plaintiff implies, but upon the proposition that where a cheaper substitute plant could be used it was not unreasonable for the Railroad Commission to take the historical cost of the old plant as its value rather than the cost to reproduce it new. The opinion is not placed upon the theory repudiated by the Supreme Court in McCardle v. Indianapolis Water Co., 272 U.S. 400, 47 S.Ct. 144, 71 L. Ed. 316. The court evaluated the present plant, but in doing so held that the historic cost should be given preferential evidentiary weight, in view of the fact that in erecting the hypothetical new plant the old facilities would not be reproduced but less expensive substitutes used.

The two other contentions of the plaintiff that the court made a double deduction for depreciation in deducting this $11,000,000, and that there was no separate finding by the Commission as to the value of the production and distributing system, are both based upon the proposition that the $105,-000,000 value fixed by the Commission was the value of the property depreciated. The court holds otherwise.

### Taxes.

In the court's findings there is a double deduction of the estimated amount saved in income taxes because of the reduced income in 1935 and 1936 so that the net income for these years fixed by the court's findings should be decreased by $281,978.95 and $257,940.70 for the respective years.

### Expenses.

It should also be noted that in an amended stipulation correcting the agreed amount of revenue and expenses, the expenses for the second year are $13,428,828.66, which is $86,825.41 less than stated by the court ($13,515,654.07), and in the third year the expenses should be $13,658,136.10, which is $95,533.10 less than the court's statement ($13,753,669.20). Thus the net revenues for these respective years must be increased by these amounts.

### Interest on the Depreciation Reserve.

██ The plaintiff contends that the court erred in adding to the revenue, which plaintiff was charged with receiving, interest on the accruals to the depreciation reserve in the preceding year in the case of the second year $153,133.74 and interest on the accruals to the depreciation reserve in the two preceding years in the case of the third year ($315,455.52).

On the straight line depreciation basis, which the court adopted in its opinion, the annual depreciation disappears from the capital for the following year,[1] and the company is entitled to returns on the balance only. Consequently, the annual depreciation should be deducted from the capital of the preceding years in fixing the rate base for the succeeding years. The result arrived at by the court, for the second and third years, was a more favorable one to the company than it was entitled to for it was only charged compound interest each year on $1,769,119 while the whole amount of the annual depreciation for the next preceding years ($3,747,167.84) remained in the rate base at a higher rate of return.

It is not necessary to discuss other claimed errors in the court's decision relied on by plaintiff in its petition for new trial.

In accordance with the above changes, the "findings of fact" at page 530 at the conclusion of the former opinion, filed herein on September 8, 1938, are supplemented and amended as follows:

### Year 1933–1934.

The court finds that for the year 1933–1934 the fair value of the company's property was $92,541,988.44 ($90,507,359 plus $1,733,344, plus $301,285.44); that the net revenue for that year was $6,030,050.28 which gives a net return of 6.516 per cent on the fair value of the company's property; that this return is a fair and reasonable one and is not confiscatory.

### Year 1934–1935.

The court finds that for the year 1934–1935 the fair value of the company's property was $92,541,988.44; that the actual gross revenue at the new rates was $22,051,590.95; that the expense for that year was $15,444,458.42 ($13,428,828.66 minus $238,092, erroneous charge for amortization of gas plants, minus $557,202, erroneous charge for amortization of cutover and repairs expense, plus $2,810,923.76, the net depreciation allowance after deducting interest on the addition to the depreciation reserve of $153,133.74 from $2,964,057.50, the annual depreciation allowance); that the net revenue was $6,607,132.53, which gives a net return of 7.139 per cent on the fair value of the company's property; that this return is a fair and reasonable one and is not confiscatory.

### Year 1935–1936.

The court finds that the fair value of the company's property for the year 1935–1936 was $92,541,988.44; that the actual gross revenue at the new rates was $23,842,427.61; that the expenses for that year were $16,036,397.77 ($13,658,136.10 minus $238,092, erroneous charge for amortization of gas plants, minus $32,248.31, erroneous charge for amortization of cutover and repairs expense, plus $2,648,601.98, the net depreciation allowance after deducting interest on the addition to the depreciation reserve of $315,455.52 from $2,964,057.50, the annual depreciation allowance); that the net revenue was $7,806,029.84 which gives a net return of 8.435 per cent on the fair value of the company's property; that this return is a fair and reasonable one and is not confiscatory.

### Conclusions of Law.

The following conclusion of law is added:

The rates fixed by the Railroad Commission of California are not confiscatory for any one of the years here involved; that is, for the years 1933–1934, 1934–1935, 1935–1936, and the plaintiff is not entitled to relief therefrom and must restore to the payors all overcharges collected in excess of the amounts due under the rates fixed by the Railroad Commission.

---

[1] It should be noted here that the court, in its opinion, stated: "It has been stipulated that our findings should cover each year in which the rates were effective, estimated upon the same rate base as is found to be correct for the year 1934. That is to say, the change in capital investment during the period from 1934 to 1936 is agreed to be negligible." This did not mean that in estimating the rate base for the last two years, on the theory adopted by the court, the court must disregard the depreciation for the preceding years. The stipulation was as follows: "That the cause be submitted upon the record now before the court * * * and that the court may make findings of fact and conclusions of law upon all issues in the cause and covering the full period or periods during which enforcement of the rates prescribed by the commission * * was restrained by the interlocutory injunction issued by this court, that is, up to and including April 30, 1936, and the court in making such findings and conclusions may consider all the evidence in the record and shall consider all evidence material and relevant as to the issue of confiscation for the twelve months' period ending July 15, 1934."